124 So.2d 441

**JOHNSON PUBLISHING CO., Inc.**

v.

**Edward DAVIS.**

3 Div. 877.

Supreme Court of Alabama.

Aug. 18, 1960.

Rehearing Denied Dec. 1, 1960.

Jones, Murray & Stewart, Robert E. Varner and Robert B. Stewart, Montgomery, for appellant.

Knabe & Nachman and Godbold, Hobbs & Copeland, Montgomery, for appellee.

**482**

STAKELY, Justice.

This is a suit for damages brought by Edward Davis (appellee) against Johnson Publishing Company, Inc., a corporation (appellant), for a libel allegedly published by the defendant in its magazine or publication entitled Jet in the issue of September 18, 1958. There was verdict and judgment for the plaintiff in the amount of $67,500. This appeal followed.

This litigation is the result of a series of events that befell Edward Davis (appellee) a Negro school teacher, age 28, a football and basket ball coach at Lovelace Junior High School in Montgomery, Alabama. He teaches science and physical education. Prior to the occurrence of these events, he was an ex-football star of Alabama State College, an institution for Negro students, and was seeking to improve himself as teacher and coach by working towards a Master's Degree at the University of Indiana.

According to the testimony of Edward Davis, in the latter part of August, 1958, he had difficulties with Rev. Abernathy. These difficulties grew out of the actions of Abernathy with reference to the wife of Edward Davis. He had had sexual relations with his (Davis's) wife. He had made complaints to Abernathy about this matter. Despite his complaints Abernathy persisted. During the summer of 1958 Edward Davis had been in Bloomington, Indiana, working on his Master's Degree at Indiana University. When he returned to Montgomery, he called on Abernathy at the church where Abernathy was pastor in another effort to get him to stop molesting his wife. According to his testimony he entered the church downstairs. He had a pistol in his pocket and a hatchet under his shirt. The hatchet was an old hatchet which he had used while teaching in Greenville, Alabama, to help along with students there to move trees and branches of trees in helping to build a park. It was not his hatchet but it had remained in the bottom of his car. He also had been traveling with a pistol in his car. He did not go directly to the study of Abernathy but had to go through the office of the secretary of Abernathy first. As Davis was entering the office of the secretary she was leaving and he asked the secretary if he might speak to the Reverend a minute. She told him, "Yes." The door of the study of Abernathy was ajar. He had the pistol in his pocket which he never took out of his pocket. The hatchet was in his shirt. When he entered the office and the secretary left, he testified that, "We started conversing about the affair with my wife as I had done pre-

viously. He stood up and I started walking around the desk to make him sit down. Dr. Abernathy got to the door and ran down the street. I came outside of the church and put the hatchet down by the back door of the church. I never touched Dr. Abernathy at any time." A police officer met them at the corner of Union Street and he was picked up by the police and taken down to police headquarters in Montgomery. Subsequently he was booked on a charge of assault with intent to murder. These charges were pressed and sworn out by Abernathy. He was subsequently tried in the Circuit Court of Montgomery and was acquitted.

Edward Davis testified that the statement contained in Jet Magazine which reads, "Earlier Davis had attacked Reverend Abernathy with a hatchet and a pistol after accusing him of an affair with his (Davis's) wife," was false. He did accuse Abernathy of having an affair with his wife but he did not attack him with either a hatchet or a gun.

He further testified that when Abernathy stood up, he started to go around the table which was between them to the left. There was a sofa there on the right and it was a tight squeeze to come in there. When Abernathy "took off that way, he took off out the door." When he started to stand up I said, "Sit down" and I made a step towards him in order to get him to sit down. He ran out of the door and when he ran out of the door he slammed it. He ran around the desk on the left side and I was around on the right side. "When he came out on the left side, he slammed the door and I had to go back around. I never touched Dr. Abernathy at any time but did display the hatchet." He testified further that he had carried the hatchet to scare Abernathy and the pistol for self defense but he never took the pistol out of his pocket. Abernathy had called his wife on the telephone and wanted to see her that night. As an excuse to her mother, he asked her to do typing for him. This was just an excuse to get her to come to his office. Abernathy did not testify in the case.

When the charges brought against Davis were presented in a preliminary hearing in the Recorder's Court of Montgomery County, the Rev. Martin Luther King was present and was arrested. In an article purportedly reporting on the events surrounding King's arrest, Jet Magazine stated:

"Actually, the minister had come to sit in on the courtroom hearing of bus boycott lieutenant Rev. Ralph D. Abernathy, who was pressing charges against schoolteacher Edward Davis, 24.

"Earlier, Davis had attacked Rev. Abernathy with a hatchet and pistol after accusing him of an affair with his (Davis') wife. Held on an attempted murder charge, he was the same Davis who resigned in June from a Greenville, Ala., grade school following charges of having sex relations with students. Montgomery Negroes speculated he was the pawn of persons seeking to embarrass Reverends Abernathy and King."

The Johnson Publishing Company, Inc., a corporation (appellant), published among other publications the Jet Magazine. It sought to show a basis for the statements from so-called "source materials." These "source materials" were taken from the Morning Advocate published in Baton Rouge, La., an article published in Chicago Sun Times and an associated Negro press release. We have carefully examined these articles but in each of these articles it was stated that Davis was "charged with" or was "accused" of attacking Abernathy. Only Jet Magazine made the statement that "Davis had attacked Reverend Abernathy with a hatchet and pistol." The editor of Jet Magazine testified that he saw no distinction between a statement that someone had committed a crime and a statement that he had been "charged with" a crime.

484

With reference to the statement in Jet Magazine that Davis "had resigned his job in a Greenville, Alabama, grade school following charges of having sex relations with students," the undisputed testimony showed that Davis had voluntarily left his job in Greenville as a high school teacher, not grade school, after obtaining a teaching position in the public schools of Montgomery. He had been given a recommendation for the Montgomery position by the Superintendent of Schools in Greenville. He had actually been reemployed in Greenville for the next school year at the time he resigned.

According to the testimony of Davis he had never had a date with a student in Greenville. He had not had sexual relations with any of the students and to his knowledge had never been so charged until after the statement appeared in Jet Magazine.

The Johnson Publishing Company sought to justify its statement by a telephone conversation which its reporter had with the Superintendent of Schools in Greenville, Alabama, Hubert Terrell. This conversation took place several days prior to the publication of the statement. However, Hubert Terrell testified that he knew of no facts which would indicate that Davis' resignation was other than voluntary. According to his testimony in his telephone conversation with the reporter from Jet Magazine, he read the letter of resignation from Davis and referred to Davis' personnel records as being absolutely clean. Hubert Terrell further testified that he had mentioned to the reporter an incident shortly before the resignation of Davis when several Negro citizens came to his office to protest the rehiring of the principal of one of the Negro schools. In stating their objections to the principal, one or more of the group stated that the principal should be discharged for rehiring Edward Davis because Davis was the father of certain children born to unwed student mothers. Hubert Terrell testified, however, that he told the Jet Reporter that he did not investigate these statements and did not know whether they were true. He further testified that he knew of no facts "which in any way reflected on Davis' performance as a teacher."

The absence of foundation to the report about Davis was in our judgment shown by the testimony of the persons who had desired the removal of Davis. Not a single one of them could give any facts to support the alleged rumor about Davis. Arthur Johnson, an executive of the Johnson Publishing Company, testified that he had heard that Davis was the father of a child born to Ruth Howard, but he could not give the name of a person who had ever stated that Davis was the father of the child. Ruth Howard took the stand later and stated that Leavy Kelly was the father of the child, who was named Leroy Kelly and that Leavy Kelly had always acknowledged the fact, had paid all expenses of the baby's birth, gave her money for its support and paid for an insurance policy on the child. She testified that she had never had sex relations with Davis nor had she had a date with him.

It was stated in behalf of the defendant that Davis was the father of a child born to Daisy Gulley. However, the undisputed testimony shows that Davis had never dated Daisy Gulley, that Davis had been attending school in Indiana for a full three months in 1958 during which time the baby of Daisy admittedly was conceived. The birth certificate of the child was introduced in evidence. It is a public record. It showed that the child's father was Robert Anthony Weaver, that the child was named for him and that the father was married to Daisy Gulley at the time of the child's birth. Daisy Gulley was subpoenaed as a witness by the Johnson Publishing Company. There was no evidence to justify the contention that Davis was the father of this child.

Testimony was presented by the defendant in an effort to prove that Davis had molested a student, Dorothy Jean Sanford. The Superintendent of Schools in Butler County testified that the charge against Davis concerning Dorothy Jean Sanford was presented to him approximately a year and a half before Davis resigned. He testified that he personally investigated the charge and at the conclusion of his investigation was satisfied "that there was no basis for the charge that Edward Davis had molested this student." He further testified that Davis had been reemployed twice following the investigation of this incident. This witness further testified that as superintendent it was his responsibility to recommend to the board of education whether a teacher should be reemployed and that he would not have recommended the reemployment of Edward Davis if he had believed that there was any "substantial ground for believing that the teacher had had sex relations with the students."

Dorothy Jean Sanford herself testified that she had not been in the school where Davis taught for a year prior to his resignation and she further testified that she had heard nothing about the incident for a year and a half prior to the time that Davis resigned.

The final effort made by the defendant to support the assertion relative to Davis's having sex relations with students was the testimony of Mary Frances Scott, a young woman who was living in Pensacola, Florida, at the time of the trial. She testified that she had sex relations with Davis while she was a student at the Greenville High School. She left school in November, 1956, approximately two months after Davis came to Greenville and almost three years before his resignation. The plaintiff introduced in evidence her own signed statement. In this statement she said that she had heard a rumor that Davis had something to do with some of the girls but she "didn't know anything about it."

She further testified that one of the teachers at the Greenville School had told her that the publishing company would probably "pay any witness to tell the truth" about Davis. Mary Frances further testified that she told the teacher "she didn't want anything to do with that kind of money." She admitted, however, in her testimony that she had contacted Ruth Howard and had told her that Johnson Publishing Company would arrange for her to go to college if she would make a statement against Davis. We note that Mary Frances Scott admitted that she had been offered money to testify in the instant case and in turn had invited Ruth Howard to testify against Davis for a payment of a college education and testify to a relationship with Davis, which he denied. Her testimony is totally unsupported except by her contradictory statements.

In addition to Superintendent of Schools Terrell, two other superintendents testified in the present case. Superintendent Self, who was the Superintendent of Schools in Greenville during the entire time that Davis taught there, gave him an unqualified endorsement as a good teacher. Superintendent Silas Garrett of the Montgomery Schools testified that he investigated Davis prior to hiring him and that he received an unqualified recommendation as a good teacher from the Greenville Superintendent. He stated that Davis was further recommended for the job of schoolteacher by a former employer, Mr. Allen Thames of Montgomery, and by the principal of the school to which Davis was assigned. The testimony of Silas Garrett, Superintendent of the Montgomery Schools, further showed that his investigation made only a short time prior to the statement in Jet Magazine, substantiated the fact that Davis had a good reputation in Greenville and Montgomery.

These superintendents testified that they would not hire a teacher or allow a teacher to continue his employment if the facts stated in Jet Magazine about Davis were

486

believed. Silas Garrett further testified that after the publication of the statement in the Jet Magazine about Davis, he was advised of the rumors about Davis and was so concerned about the matter that he made a second investigation of Davis and was advised by Superintendent Hubert Terrell "that his information and his record indicated that these rumors (against Davis), were completely false."

Although the defendant, Johnson Publishing Company, sought to present "source materials" for the statements with reference to Davis, not one of its selected "source materials" had any reference to any sex charges against Davis. The only evidence shown by the record as being in possession of Jet at the time it published its statement that related to the sex charges against Davis came from Superintendent Hubert Terrell and he told the Jet representative that he did not know if the charge against Davis had any truth in it, that he had never investigated it whatsoever, that he knew of no other charge against Davis and he made it clear to the Jet representative that there had been no pressure on Davis to resign. Despite the warning that the charge against Davis was uninvestigated and possibly false and that the resignation of Davis was apparently voluntary, Jet published the statement which we have heretofore set out.

The record shows that the Jet reporter who had had this conversation with Superintendent Hubert Terrell was present in court but did not testify.

The evidence showed that Reverend King was an editorial writer for Johnson Publishing Company at the time of the publication of the statement concerning Davis. Twice Davis wrote Johnson Publishing Company a letter demanding retraction of the statement. It made no retraction. Although the Johnson Publishing Company circulated on a national scale the foregoing statement against Davis and purportedly investigated the facts before publishing them, no one from that organization talked to Davis about the charges made against him.

In considering the extent of the alleged libel and the damage calculated to ensue to a school teacher from its publication of such statement, certain things are obvious from the testimony. Davis could not obtain or hold a teaching position if the statements in Jet magazine about him were believed. The extent of the circulation of the alleged libel was large. More than 10,500 copies of the September 18, 1958 issue in which the statements were published, were sold in Alabama alone. Fifteen hundred copies of this issue were sold from news stands in Montgomery and surrounding counties. Jet magazine is a publication published and circulated on a national scale.

■■ I. It is argued by the appellant that the verdict of the jury was against the great weight of the evidence and that the affirmative charge should have been given for the defendant. We do not agree. This court has often held that unless after allowing all reasonable presumption of its correctness, the evidence against the verdict is so decisive as to clearly convince the court that it was wrong and unjust, there is no basis on which this court can reverse the trial court in refusing to grant a motion for a new trial sought on the ground that the verdict and judgment are contrary to the weight of the evidence. Sorrell v. Lindsey, 247 Ala. 630, 25 So.2d 725; Housing Authority of City of Decatur v. Decatur Land Co., 258 Ala. 607, 64 So.2d 594. Futhermore the favorable presumption which attends the correctness of the verdict of the jury is strengthened when the presiding judge refuses to grant a new trial. Housing Authority of City of Decatur v. Decatur Land Co., supra; Sorrell v. Lindsey, supra.

■■ II. It is further insisted that the published words made the basis of the libel action do not in substance show a libel. With this position we do not agree. Pub-

lished words, made the basis of a libel action, must be construed according to their natural and probable effect upon the mind of the average lay reader. We consider the statement published by Johnson Publishing Company to be libelous per se. White v. Birmingham Post Co., 233 Ala. 547, 172 So. 649; McGraw v. Thomason, 265 Ala. 635, 93 So.2d 741.

■■ III. It is insisted by the appellant that there is nothing to show that the matter complained of was maliciously published. We do not agree. Malice, actual or expressed, may be shown by evidence of hostility, rivalry, the violence of the language, the mode and extent of publication, including the recklessness of the publication and prior information regarding its falsity. Kenney v. Gurley, 208 Ala. 623, 95 So. 34, 26 A.L.R. 813.

■ IV. It is insisted that the amount of the verdict, which was $67,500, is excessive. In giving this matter our serious attention we have considered this matter from two points of view. In the first place we are guided by certain principles. The matter of damages must be left to the discretion of the jury, whose judgment ordinarily should not be interfered with unless the amount is so excessive as to show passion or prejudice, or other improper motive. International Union, etc. v. Palmer, 267 Ala. 683, 104 So.2d 691; Liberty National Life Insurance Co. v. Weldon, 267 Ala. 171, 100 So.2d 696, 61 A.L.R.2d 1346.

The trial court in this case refused to grant a motion for a new trial based, among other grounds, on the ground that the verdict was excessive. When the trial court refuses to grant a new trial because it does not think the verdict to be excessive, the favorable presumption attending the verdict of the jury is thereby strengthened. International Union, etc. v. Palmer, supra; Advertiser Co. v. Jones, 169 Ala. 196, 53 So. 759; Airheart v. Green, 267 Ala. 689, 104 So.2d 687.

■ In arriving at the amount of damages which should be assessed the jury in fixing punitive damages, which are available in a libel case where malice is proved to the reasonable satisfaction of the jury, the jury should give due regard to the enormity of the wrong and to the necessity of preventing similar wrong. The punishment by way of damages is intended not alone to punish the wrongdoer, but as a deterrent to others similarly minded. Liberty National Life Insurance Co. v. Weldon, supra; Advertiser Co. v. Jones, supra; Webb v. Gray, 181 Ala. 408, 62 So. 194.

■ Where words are libelous per se and as heretofore stated we think the published words in the present case were libelous per se, the right to damages results as a consequence, because there is a tendency of such libel to injure the person libeled in his reputation, profession, trade or business, and proof of such pecuniary injury is not required, such injury being implied. Advertiser Co. v. Jones, supra; Webb v. Gray, supra; Brown v. Publishers: George Knapp & Co., 213 Mo. 655, 112 S.W. 474; Maytag Co. v. Meadows Mfg. Co., 7 Cir., 45 F.2d 299.

■ Because damages are presumed from the circulation of a publication which is libelous per se, it is not necessary that there be any correlation between the actual and punitive damages. Advertiser Co. v. Jones, supra; Webb v. Gray, supra; Whitcomb v. Hearst Corp., 329 Mass. 193, 107 N.E.2d 295.

■ The extent of the circulation of the libel is a proper matter for consideration by the jury in assessing plaintiff's damages. Foerster v. Ridder, Sup., 57 N.Y.S.2d 668; Whitcomb v. Hearst Corp., supra.

We are impressed with the careful charge of the trial court. We feel that the jury did its duty under the circumstances, except as we shall point out. The verdict seems to us to reflect the degree of the

wrong of a national publication that stooped to circulate an unfounded charge with knowledge that the charges were uninvestigated and that the teacher had resigned as a result of the charges when the publisher had been plainly advised to the contrary. It is argued by the Johnson Publishing Company that Edward Davis suffered little pecuniary or actual damage and that we should consider the difference between punitive and actual damages. We consider that this published statement shows actual damage because it was sufficient to cause a teacher to be discharged, if believed. The fact that Davis was not discharged does not redress the substantial monetary loss which he would have suffered if he had been discharged. Humiliation and injured feelings should be considered in assessing the actual damages suffered by Davis. According to his testimony students brought copies of the magazine to class and circulated it in his presence. They yelled, "Jet, Jet" at him. According to the testimony parents demanded that he be forced to resign or be discharged. This certainly seems to be evidence of the contempt which the libel had inspired for Davis among readers of the publication. He was ostrasized and shunned by his people. He was no longer invited to speak at banquets and other affairs given by his people. In the case of Advertiser Co. v. Jones, supra [169 Ala. 196, 53 So. 764], this court said: "Of all the cases left to the jury, none is more emphatically left to their sound discretion than such a case as this."

In Webb v. Gray, supra [181 Ala. 408, 62 So. 196], this court made it clear that a different rule for damages is applicable in libel than in malicious prosecution cases and other ordinary tort cases. In this case the court stated in effect that in libel cases actual damages are presumed if the statement is libelous per se and accordingly no actual damages need be proved. In this case this court said:

"When words are slanderous in themselves, the right to damages follows as a consequence from speaking in a slanderous way, because it is the incalculable tendency of slander to injure the person slandered, in his reputation, profession, trade, or business.

"It would frequently be difficult to prove any pecuniary injury from slander, and always impossible to establish its full extent * * *. Therefore, when words are actionable in themselves, the law implies damages."

In Advertiser Co. v. Jones, supra, this Court considered in a libel case the claim that the damages were excessive and stated:

"While the damages are large in this case we cannot say that they were excessive. There was evidence from which the jury might infer malice, and upon which they might award punitive damages. This being true, neither the law nor the evidence furnishes us any standard by which we can ascertain certainly that they were excessive. The trial court heard all of this evidence, saw the witnesses, observed their expression and demeanor, and hence was in a better position to judge of the extent of punishment which the evidence warranted than we are, who must form our conclusions upon the mere narrative of the transcript. This court, in treating of excessive verdicts in cases in which punitive damages could be awarded, through Justice Haralson spoke and quoted as follows: 'There is no legal measure of damages in cases of this character.' "

We have examined cases from other jurisdictions. In Nailor v. Ponder, Del., 41 A. 88, the court stated that if the jury found slander for which the action was brought was uttered maliciously, the jury might give exemplary damages to punish the defendant for the wrong without having regard to proof of actual damages. See 33 A.L.R. 414, 415.

The Supreme Court of Missouri considered the question in Brown v. Publishers: George Knapp & Co., 213 Mo. 655, 112 S. W. 474, 485, and said:

"The action for libel is one to recover damages for injury to man's reputation and good name. It is not necessary, in order to recover general damages for words which are actionable per se, that the plaintiff should have suffered any actual or constructive pecuniary loss. In such action, the plaintiff is entitled to recover as general damages for the injury to his feelings which the libel of the defendant has caused and the mental anguish or suffering which he had endured as a consequence thereof. So many considerations enter into the awarding of damages by a jury in a libel case that the courts approach the question of the excessiveness of a verdict in such case with great reluctance. The question of damages for a tort especially in a case of libel or slander is peculiarly within the province of the jury, and unless the damages are so unconscionable as to impress the court with its injustice, and thereby to induce the court to believe the jury were actuated by prejudice, partiality, or corruption, it rarely interferes with the verdict."

We call attention to the argument of the appellant that Davis suffered no damages because he was not fired. This same contention was made in Foerster v. Ridder, Sup., 57 N.Y.S.2d 668, 673, in which the defendant circulated to approximately sixty people a libel to the effect that the plaintiff was a malicious liar. The jury gave the plaintiff, a respected teacher, $100,000 in damages. The teacher did not lose his job, the court commenting that his fine record was a protection for him. In reducing the award of the jury from $100,000 to $50,000, the New York Court indicated an award of $100,000 "might well be sustained" where "the libel found circulation through the medium of a metropolitan newspaper."

The court emphasized that the libel "was circulated only to the extent of the issuance of sixty copies thereof, at the most."

In the Foerster case, supra, the court cited with approval the case of Seested v. Post Printing & Publishing Co., 326 Mo. 559, 31 S.W.2d 1045, 1054. In the Seested case the jury awarded $100,000 compensatory damages and $100,000 punitive damages. The defendant had charged Seested with aiding Germany at a time that feeling was very strong against that country. Seested did not lose his job and suffered no apparent pecuniary loss. The Missouri court stated:

"Appellant was a million dollar corporation, and it owned and controlled a metropolitan newspaper of large circulation, through and by means of which it committed the wrong. The duty which the jury was called upon to discharge in the award of punitive damages was to assess such a penalty as would be adequate to punish appellant and deter others of like minds and possessed of the same means of inflicting injury from perpetrating similar wrongs. Does an assessment of a penalty of $100,000 (solely punitive), all the facts and circumstances considered, manifest an abuse of discretion. Courts are not endowed with any unusual or peculiar discernment in such matters. The test usually applied by them is whether the assessment is so excessive as to shock the 'judicial conscience'. The judicial conscience is presumed to be representative of the consciences of all judicially minded right-thinking men and women. Applying as best we may the test just referred to, we are unable to say that there was any abuse of the discretion lodged with the jury, so far as the assessment of punitive damages is concerned."

See also Edwards v. Nulsen, 347 Mo. 1077, 152 S.W.2d 28; Reynolds v. Pegler, 2 Cir.,

223 F.2d 429; Whitcomb v. Hearst Corp., 329 Mass. 193, 107 N.E.2d 295; Kroger Grocery & Baking Co. v. Rosenbaum, 171 Va. 158, 198 S.E. 461; Evans v. Star Co., 124 Misc. 777, 209 N.Y.S. 267; Maytag Co. v. Meadows Mfg. Co., 7 Cir., 45 F.2d 299.

We think that from the foregoing decisions it is clear that while there may be some correlation between actual and punitive damages, punitive damages may be greatly in excess of the actual damages. In International Union, etc. v. Palmer, 267 Ala. 683, 104 So.2d 691, this court affirmed a judgment of $18,450, where the pecuniary loss could not have been more than $450. This court indicated that it was not concerned with attempting to determine what part of the remaining $18,000 was for mental anguish, as distinguished from exemplary damages, and stated: "Both were largely discretionary with the jury."

But in the assessment of damages there is another feature of the case which we should consider. A part of the alleged libelous publication is the statement that, "Earlier Davis had attacked Reverend Abernathy with a hatchet and pistol accusing him of an affair with his (Davis') wife." It is true that Davis had been bound over to await the action of the grand jury on the charges of Abernathy of assault with intent to murder. He was tried on that charge and while he was acquitted, there was one aspect of the case which should be considered here. When Abernathy stood up Davis advanced on him, displaying the hatchet. It is true that Davis never struck Abernathy with the hatchet but at the same time advancing on Abernathy with a hatchet might be enough to warrant Abernathy in fleeing from what he might have considered impending danger. Truth of some of the statements attributed to the defendant may be shown in mitigation of damages. Jacobs v. Herlands, 257 App.Div. 1050, 13 N.Y.S.2d 707; Fleckenstein v. Friedman, 266 N.Y. 19, 193 N.E. 537, and "Well settled is the basic rule that the amount of plaintiff's recovery may be reduced by proof of facts 'tending but failing to prove the truth' of the libel's charge." Crane v. New York World Telegram Corp., 308 N.Y. 470, 126 N.E.2d 753, 757, 52 A.L.R.2d 1169.

Proof in mitigation of damages as we shall later point out may be shown under the general issue. There is therefore some element of truth in this part of the alleged libelous statement. And it seems to us that this part of the alleged libel should be considered in mitigation of the damages. It is not easy for us to say just how much the damages should be reduced but upon a fair consideration of the matter, we have decided that if the verdict is to stand the amount of the verdict should be reduced to $45,000.

V. It is insisted that the defendant, the Johnson Publishing Company, was not amenable to the jurisdiction of the Circuit Court of Montgomery County. The record, however, shows that the Johnson Publishing Company was served pursuant to the substitute service statute as set forth in § 199(1), Title 7, 1955 Cumulative Pocket Part, Code of 1940. Without question the record shows that the service was had in accordance with the requirements of the statute. In Ex parte Smith, 258 Ala. 319, 62 So.2d 792, 795, this court said:

"When those matters (i. e. compliance with the service provisions) appear of record in the cause they show on the face of the proceeding a sufficient service on the defendant to support a personal judgment against him as if personally served within the State."

In this opinion the court equated the requirements for service on nonresident motorists (§ 199) with service on nonresidents who do business in the state (§ 199(1), supra).

The question of service was raised by motion to quash the service and by a plea in abatement. No evidence was introduced however to support either the

motion to quash or the plea in abatement. We, therefore, have only the record before us, and therefore nothing to show that on the record there was lack of due process in bringing the Johnson Publishing Company within the jurisdiction of the Circuit Court of Montgomery County.

■ VI. It is argued that since Johnson Publishing Company is a foreign corporation not qualified to do business in Alabama, but actually doing business in Alabama, it was not properly sued in Montgomery County unless there is affirmative evidence in the record that it did business in Montgomery County. This is not correct. In St. Mary's Oil Engine Company v. Jackson Ice & Fuel Company, 224 Ala. 152, 138 So. 834, 839, this court said:

"The statutes prescribing the venue of personal actions (sections 10467, 10471, Code 1923) are not applicable to nonresident individuals or nonresident corporations which have not qualified to do business in this state, and therefore the defendant was suable in any county in the state where service of process might be made * * *. The defendant's plea in abatement was therefore overruled without error."

Besides it was stipulated in open court that Johnson Publishing Company is an Illinois corporation and has never qualified to do business in Alabama but it was doing business in Alabama in September, 1958, at the time this suit was instituted without any suggestion of any geographical limitation on the extent of business done in Alabama.

■ In addition to the foregoing the burden of proof on the plea raising the question of venue rested on the Johnson Publishing Company. McCord v. Harrison & Stringer, 207 Ala. 480, 93 So. 428; Burch v. Ingham Lumber Co., 212 Ala. 204, 102 So. 19.

So, assuming for the purpose of discussion that the venue statutes do apply, an absence of evidence in the record regarding the counties in which it did business, would not sustain a plea in abatement on venue. It would have been necessary for the Johnson Publishing Company to prove that it did no business in Montgomery County.

■ VII. It is argued that since § 474 (1—18), Title 7, 1955 Cumulative Pocket Part, Code of 1940, is a part of Article 6 of the aforesaid title, these sections should be construed in the light of pre-existing law requiring that the party against whom a deposition is sought is entitled to ten days notice of the commissioner suggested prior to the appointment. We do not think this contention has merit. We presume that this argument is related to the taking of the deposition of the party defendant, Johnson Publishing Company by Robert E. Johnson, its designated representative. No depositions of witnesses were taken by the appellee in this case.

Section 474(7), Title 7, supra, provides as follows:

"The notice shall state the time and place of taking the deposition and the name and address of each person to be examined, if known, and, if the name is not known, a general description sufficient to identify him or the particular class or group to which he belongs."

Section 474(12), Title 7, supra, provides in part as follows:

"* * * before an officer authorized to administer oaths by the laws of the United States, or of the state of Alabama, or of the place where the examination is held, or before a person appointed by the court in which the action is pending. No deposition shall be taken before a person who is a relative or employee, or attorney or counsel of any of the parties, or is a relative or employee of such attorney or counsel, or is financially interested in the action."

ᵣ The record shows that Hallowell Lewis, one of the official court reporters of the Montgomery Circuit Court, is the person before whom the deposition was taken. He is an officer authorized to administer oaths by the State of Alabama and there is nothing to show that he was either a relative or employee in the prohibited manner set out in § 474(12) or that he is financially interested in the case at bar.

It is next argued that assignments of error numbered respectively 83, 84, 85, 86 and 87 refer to erroneous rulings. We fail to find any merit in these assignments of error. Assignment 83 relates to an order for the taking of a deposition in Chicago, which never occurred. Assignments of error 84 and 85 concern the production of certain books in court. ·We fail to see how this involves the appointment of a commissioner in deposition proceedings. Assignment of error No. 86 involves the appearance of John N. Johnson in Montgomery, Alabama, an event which never took place. Assignment of error No. 87 involves an order regarding "the deposition of agents of appellant" in Montgomery, an event which also did not occur. The only deposition taken by the appellee was, as pointed out above, the deposition of the party defendant, Johnson Publishing Company, by its designated representative.

The position is further taken by the appellant that "courts considering the question (of simultaneous oral and written discovery) have uniformly answered the question in the negative." We point to the amendment of Rule 33 of the Federal Rules of Civil Procedure, 28 U.S.C.A. In 4 Moore's Federal Practice, 2nd Edition, § 33.09, p. 2287 et seq., we find the following:

"It is clear that under the amended rule no leave of court is necessary for the taking of a deposition after interrogatories have been answered, or for the service of interrogatories after a deposition has been taken, and that the burden is on the opposing party or deponent to show that a hardship or injustice is being done him or that for some other reason the discovery should not be allowed. The approach taken in the * * * Currier * * * case is not proper under the present rule, and even where an oral deposition is taken after answers to interrogatories have been served the court should not attempt to limit the scope of the examination in advance in the absence of a convincing showing of bad faith or harassment."

█ The appellant also complains that its deposition was taken without provision for expenses. So far as we can find there is nothing in the record to show that this matter was ever raised in the court below. Besides the appellee offered to go to Chicago to take this deposition at appellant's home office. We will not put the trial court in error with reference to these expenses when the matter of expenses was never brought to its attention.

█ It is insisted further that the Circuit Court of Montgomery County has no power to compel the attendance of a witness outside its jurisdiction at a deposition in a foreign state. As we have pointed out, the appellee took only the deposition of a party to the cause, after its general appearance upon its admission that it was doing business in Alabama, although not qualified to do so. It does not seem reasonable to us that the legislature intended by § 375 that a plaintiff would be totally unable to take the deposition of a nonresident corporate defendant, admittedly doing business in the State of Alabama, which had appeared generally in the cause and had taken the plaintiff's deposition. 4 Moore's Federal Practice, 2nd Ed. p. 2018; Bodenstadt v. Parke, Davis & Co., 1 A.D.2d 670, 146 N.Y.S.2d 377; Grattan v. Societa Per Azzioni Cotonificio Cantoni, 285 App.Div. 10 l2, 140 N. Y.S.2d 154.

■ VIII. The original complaint in this cause of action made the Johnson Publishing Company the sole defendant. The plaintiff, however, filed an amendment to his original complaint adding as a party defendant thereto Leon S. Levine, who does business in the City of Montgomery, Alabama. Proof showed that he had no connection with the libel except that he distributed approximately 1000 magazines, including the magazine in which the alleged libelous article was published; that he did not and could not read these magazines before they were distributed; that there was nothing to call his attention to the fact that there might be a controversial article in such magazine; that he had no control whatever over the editorial policy of the company which publishes Jet Magazine. The court held that the evidence showed no case against Levine and gave the affirmative charge requested in his behalf.

As well as we can understand the contention of the appellant, it appears that the appellant complains that Levine was joined merely to enable the state court to get jurisdiction of the case and further complains the case was not tried in the Federal court.

We fail to find any reversible error in the effort to join Levine as a defendant in the case. There are cases which hold that distributors have been held liable in libel suits, despite a claim of lack of knowledge. We refer for example to Holden v. American News Co., D.C., 52 F.Supp. 24; Hartmann v. American News Co., D.C., 69 F.Supp. 736.

■ Complaint really seems to be made that this case was not tried in the federal court. Of course federal jurisdiction had to be based on the removal statutes (Title 28 U.S.C.A. § 1441 et seq.), because this case originated in the state court. The record shows that there was an attempt by the appellant to remove this case to the federal court. However, the attempt came too late since it was not within 20 days from the receipt by this defendant of a copy of the initial pleading setting forth the claim for relief upon which the action was based.— Title 28 U.S.C.A. § 1446(b). Accordingly, even if Levine had not been joined or had not been a citizen of Alabama, and even if the case had been one which involved a separate and independent claim or cause of action, removable if sued upon alone within the meaning of title 28, § 1441 (c), appellant would have had to remain in the state court. And so the District Court remanded the case to the Circuit Court of Montgomery County from which it had come. Its order of February 5, 1959, recited that the remandment came "upon a consideration of said motion (plaintiff's motion to remand), the arguments of counsel in support of and in opposition thereto." This order of remandment "is not reviewable on appeal or otherwise."—Title 28 U.S.C.A. § 1447(d). It seems to us that the appellant now seeks to have this court do what a federal appellate court, including the Supreme Court of the United States, is powerless to do, namely, review the order of remandment.

"An order of a District Court remanding a cause to the state court from whence it came is not appealable, and hence may not be reviewed either in the Circuit Court of Appeals or here." Aetna Casualty & Surety Co. v. Flowers, 330 U.S. 464, 466, 467, 67 S.Ct. 798, 799, 91 L.Ed. 1024.

IV. Assignments of error are based on the action of the court in overruling the demurrers to the complaint as amended. The complaint as amended contains two counts, Counts One and Two. The only difference between the two counts in the original complaint and the counts in the amended complaint is the difference in the amount sued for. The report of the case will set out Count One as amended. Count two is similar to count one except that the words "with an intent to defame the plaintiff" do not appear in count two. The grounds of demurrer are as follows: (1) The complaint is vague about the place of libel. (2) There is a misjoinder of parties defendant since there is no allegation that

the defendants had acted in concert. (3) There is a misjoinder of causes of action in the same count, since the complaint alleged libels in Chicago, in Montgomery and in Alabama, thus containing three separate causes of action in the same count. (4) From the complaint it might appear that Davis was married to the grade school students it is charged that he had had sex relations with. (5) The complaint is not clear that he might have had a business, though it alleges that he was injured in the lawful pursuit of his office, profession, trade or business.

We find no vagueness in the allegations as to the place of libel. In Collins v. Brotherhood of Railroad Trainmen, 226 Ala. 659, 148 So. 133, 134, this court in upholding the complaint, said:

"'Plaintiff avers that libelous publication was made in Jefferson County, state of Alabama, during the latter part of the year 1923, and in the first part of the year 1924, and at sundry other times and places unknown to plaintiff.'"

A similar complaint was upheld in Weir v. Brotherhood of Railroad Trainmen, 221 Ala. 494, 129 So. 267. In the Collins case, supra, the court further said:

"Inasmuch as the defendants were before the court, and within its jurisdiction, the plaintiff might well have proceeded against them by proper amendment for the publication of the Smith letter in the state of Georgia, if it was in fact published in that state; and likewise for the publication of the same letter in the state of Ohio, if it was in fact published in that state * * *."

We find no merit in the proposition that a complaint against two defendants for libel must allege a concert of action. In fact the appellant seems to concede that there is no merit in this proposition. However, we point out that this court has held that libel, unlike slander, is a tort capable of joint commission by two or more persons. Smith Brothers & Co. v. W. C. Agee & Co., 178 Ala. 627, 59 So. 647, 648; Atlantic Glass Co. v. Paulk, 83 Ala. 404, 3 So. 800; Liberty National Life Ins. Co. v. Weldon, 267 Ala. 171, 100 So.2d 696, 61 A.L.R.2d 1346. In Great Atlantic & Pacific Tea Co. v. Traylor, 239 Ala. 497, 195 So. 724, this court in substance held that a tort charged to have been committed by two persons is several as well as joint, unless the liability of one is because of his responsibility for the act of the other instead of for his own act.

In the case of Age-Herald Pub. Co. v. Huddleston, 207 Ala. 40, 92 So. 193, 37 A.L.R. 898, which is cited to support the contention that there is a misjoinder of action because there is an allegation of publication in Chicago, Montgomery and throughout the State of Alabama, a statute was construed which required that venue for libel suits against a foreign or domestic corporation be in any county in which the corporation did business and that all actions for personal injuries should be brought in the county where the injury occurred or in the county where the plaintiff resided. The Age-Herald case was a venue case. As we have heretofore pointed out, the venue statutes do not apply to this foreign corporation which is not qualified to do business in Alabama.

Further discussion with reference to the demurrers to the counts of the complaint as amended seems to us to be unnecessary.

X. Assignments of error are made as to the action of the court in sustaining demurrers to Pleas 4, 5 and 13. These pleas will appear in the report of the case. So far as we can see only Plea 4 purports to be a defense to the action. Pleas 5 and 13 are denominated pleas in mitigation of damages. It is argued that the court was in error in sustaining the demurrer to Plea 4 because the demurrer was too general and because the plea was good as pleading the substantial truth of "substantially the facts set out in the libel."

■ It is elemental, however, that a plea in bar must within itself present a complete defense to the action. Ferdon v. Dickens, 161 Ala. 181, 49 So. 888; Alabama Great Southern R. Co. v. Herring, 234 Ala. 238, 174 So. 502.

■ It seems to us to be conceded by the appellant that the matter relied upon in justification of Plea 4 is not the libelous matter which is the subject of the action. For example, the description of the school in Greenville at which Davis taught, namely, a "grade school" does not appear in Plea 4. While the libel stated that Davis "resigned following charges of having sex relations with students," Plea 4 states that he "did resign after charges had been made to the school board." In other words, Plea 4 does not claim that the libelous matter is true. It only claims that certain paraphrasing is true. From our study of all the pleas, it seems to us that it was intended by Plea 4 to state something different from Plea 2, which alleges that the publication of the matter alleged in the complaint was substantially true. Plea 2 was a good plea and the demurrer to it was overruled. Since the demurrer to Plea 2 was overruled and the plea held good, we find no error in sustaining the demurrer to Plea 4. It seems to us not only to constitute a departure from the libelous matter but also because all the benefit which might accrue under Plea 4 could be had under Plea 2. Southern Cotton Oil Co. v. Walker, 164 Ala. 33, 51 So. 169.

■ Pleas 5 and 13 purport to be in mitigation of damages and not in bar. The demurrer pointed out this defect. As we understand this contention, appellant seeks to justify the efficacy of its plea in mitigation by the argument that because evidence in mitigation of damages may be given under the general issue, a plea in mitigation of damages is a defense in bar of the action. But this position was rejected by this court in Ferdon v. Dickens, 161 Ala. 181, 49 So. 888, 890, holding insufficient matters and facts contained in a plea which might be given in evidence under the general issue in mitigation of damages, this court said:

"Certainly such matters cannot constitute a defense or bar to an action of libel. It is therefore only necessary to determine whether or not the demurrer sufficiently challenges the defects of the plea. While many of the grounds alleged in the demurrer are insufficient and do not point out the defect or insufficiency in as definite language as might be employed, we think some of the grounds sufficiently certain to authorize—indeed, to impel—the court to sustain the demurrer to a plea so palpably insufficient as this."

Moreover, the court continued in language relevant in answer to appellant's arguments regarding the sufficiency of the demurrer, that:

"The plea being fatally defective, in substance, as a plea in bar, and the matters and facts set out in such plea being available to the defendant under the general issue, in mitigation of damages only, and not in defense, it could have been stricken from the file, upon motion, without putting plaintiff to a demurrer. This being true, a very general demurrer would be sufficient. The palpable defect in the plea was that the matters and facts alleged in the plea were availing only as evidence in mitigation of damages, and not in bar of the action. While this particular ground is not clearly and succinctly stated in the demurrer, yet we hold the demurrer sufficient to test this question."

■ XI. Reversal is sought because of the action of the trial court in denying a requested continuance of the trial of the case. We find no merit in this contention. The trial took place 140 days after service of process on defendant. In Knowles v. Blue, 209 Ala. 27, 95 So. 481, this court held that the thirty day period allowed by statute (§ 248, Title 7, Code of 1940), is presumably a sufficient time for a defendant

to prepare his side of the case for trial. In Ray v. Richardson, 250 Ala. 705, 36 So. 2d 89, it was held that the trial court properly denied continuance when the case was tried on April 10, 1947, after process had been executed on February 20, 1947.

■ This court has often held that continuances are not favored and that a trial court's denial of a motion for continuance will be upset only when a palpable or gross abuse of discretion has been shown. American Rubber Corp. v. Jolley, 260 Ala. 600, 72 So.2d 102, 67 A.L.R.2d 489; Dollar v. McKinney, 267 Ala. 627, 103 So.2d 785.

Appellant contends that it should have had the continuance because of the "condition" of the publisher, John H. Johnson, but the record shows that John H. Johnson was not too unwell to attend the trial. Ex parte Central Alabama Dry Goods Co., 238 Ala. 20, 189 So. 56.

■ XII. It is contended that the trial court committed reversible error by accepting the general verdict of the jury. In other words, it is argued that under § 262, Title 7, Code of 1940, special findings are required even by the jury where the parties request it. This is not correct. Section 262, Title 7, Code of 1940, does not refer to special findings by the jury. It refers to special findings by the court. So far as we can ascertain the only cases where special findings are required are cases where the case was tried by the court without a jury. In All States Life Ins. Co. v. Jaudon, 230 Ala. 593, 162 So. 668, 669, this court said:

"We have no statute for special findings of fact as in some states. Where only one issue is presented, and a general verdict clearly settles the same, it is the right of the jury to write a general verdict, and it is held error for the court to require a special verdict."

See also Little v. Sugg, 243 Ala. 196, 8 So.2d 866; Spry v. Pruitt, 256 Ala. 341, 54 So.2d 701.

It is asserted that the law is clear that the word "court" includes judge and jury. In City of Huntsville v. Pulley, 187 Ala. 367, 65 So. 405, 406, this court pointed out that "the word 'court' is often used to designate the head of the tribunal in the person of the presiding judge, as contradistinguished from the jury." The Pulley case indicates that whether the word "court" is used to include judge and jury or merely the judge "must be determined upon a consideration of subject-matter, context, and the general policy of the law."

We see no reason for construing § 262, Title 7, Code of 1940, so as to provide for special findings by a jury. This is a matter which calls for legislative action if any action is needed.

■ XIII. A number of rulings on the evidence are made the basis of assignments of error. The first ruling is with reference to the action of the court in permitting an answer to a question asked the witness Self. He was asked "if there was any pressure of any kind to your knowledge ever brought on Edward Davis to resign by the school authorities while you were Superintendent of Schools in Greenville." He answered, "There was no pressure brought by the school people to have him fired." It is insisted that this question "invades the province of the jury and it is manifestly illegal and irrelevant" and is, therefore, an exception to Rule 33 of the Rules of Circuit and Inferior Courts, Code 1940, Tit. 7 Appendix. Objection to this question was general and not specific but apart from this the fact is ignored that the libelous statement was clearly subject to the interpretation that Davis resigned as the result of the pressure of charges brought against him. The answer of the witness Self was brought out to negate the clear inferences from the statement that Davis was pressured into resigning. As stated in Birmingham Railway Light & Power Co. v. Landrum, 153 Ala. 192, 45 So. 198, 201, "Defendant stated no ground of objection to the question, and the court below could not be compelled to hunt for grounds."

The second proposition is based upon the ruling of the court in allowing the witness Self to testify that in his official capacity as Superintendent of Schools, he made a determination that a complaint against Davis was not well founded. But the libel in this case had stated that Davis "resigned following charges." It was, therefore, relevant for the plaintiff to show that the charge relied on had been investigated by the school authorities and found groundless approximately a year and a half prior to the resignation of Davis. The jury had to decide on the issue of truth, whether in fact there had been any causal connection between the charges and the resignation. So it was relevant on this issue for the jury to receive evidence that the superintendent who had the duty of investigation in the regular course of his duties to testify that he had investigated the charges and found them baseless.

It may be added that the only ground of objection to the question was that the answer was not in response to the question. The remedy for an unresponsive answer is a motion to exclude that part of the answer which is unresponsive. McDonald v. Wood, 118 Ala. 589, 24 So. 86.

The third contention is that the trial judge erroneously overruled a general objection and permitted Superintendent Terrell to answer the question whether he gave the Jet representative "any information which could have formed the basis for an assertion that Davis resigned from the Greenville, Alabama, school following charges of having had sex relations with students * * *" The record seems to show that the objection was general and assigned no ground. However, in our judgment the question was proper. The witness had already been asked to detail his recollection of the conversation between him and the representative of the Jet magazine. He gave as complete account of his conversation as his recollection would permit. This conversation had taken place many months prior to the trial and after the witness had attempted to detail the conversation, he was asked the foregoing question. Judge McElroy in Vol. I of his treatise on "The Law of Evidence in Alabama," at p. 297, makes the following observation:

"A witness may testify to his opinion upon data observed by him if such data cannot be described by the witness so fully and exactly as that the trier of fact would not be equally as able as the witness to form its own opinion from such description as the witness is able to give; but before the witness may testify to his opinion, he must describe to the extent of his ability, the data on which his opinion is based. [Hamilton v. Cranford Mercantile Co.], 201 Ala. 403, 78 So. 401; [Birmingham Railway & Electric Co. v. Baylor], 101 Ala. 488, 13 So. 793; [Tucker v. Tucker], 248 Ala. 602, 28 So.2d 637. Contra: [Dozier v. State], 130 Ala. 57, 30 So. 396; [Burke v. Tidwell], 211 Ala. 673, 101 So. 599."

It certainly appears that Superintendent Terrell had described to the best of his ability the data on which his opinion was based. In discussing the almost indistinguishably fine line between admissibility and rejection of such evidence in some of the cases, Judge McElroy at pp. 299–300 of his foregoing treatise, makes the following statement:

"This confused state of the decisions calls for, desperately calls for, some sort of revision that will make the Opinion Rule manageable. It is submitted that because of the palpable obscurity, the utter unknowableness, of the border line betwen a so-called statement of opinion and a so-called statement of fact, that the only feasible method of dealing with the borderline cases is to commit the settlement of such cases to the sound discretion of the trial court, and to say that the ap-

pellate court shall reverse the decision of the trial court only for an abuse of discretion that prejudices the party against whom the ruling is made. This revision would not be a radical departure from accustomed judicial methods; such a revision would be in keeping with numerous accepted precedents of the law vesting a discretion in the trial court in making decisions upon borderline questions of practice and procedure including evidence.

As Judge McElroy points out this court has approved a rule investing "a certain discretion" in the trial court in ruling on this type of evidentiary question. See Dersis v. Dersis, 210 Ala. 308, 98 So. 27; Rollings v. State, 136 Ala. 126, 34 So. 349.

The fourth question relating to the ruling of the trial court on the evidence was the question addressed to the editor of Jet Magazine on cross examination as to whether it was the intent of Jet to convey the meaning that Davis was forced to resign from the Greenville school because of the charges brought against him. It seems to us that such a question is clearly proper. It seems clear that on cross examination a question which seeks to find the intent of the publisher is relevant on the issue of malice.

It is argued that the trial court was in error in allowing the admission in evidence of the magazine containing the libelous article. We find no merit in this contention. The prominence of the article in the magazine was clearly relevant on the question of the extent of the damage. No authority is cited which holds that it is error to permit the jury to see the alleged libel in the context of its publication. This court has held that the fact of insurance is grossly prejudicial to the defendant, but if the matter of insurance is relevant to an issue of the case, it may not be excluded from the jury because of possible prejudice. Moore-Handley Hardware Co. v. Williams, 238 Ala. 189, 189 So. 757.

XIV. The appellant insists that the court was in error in refusing a number of charges based on the theory that the complaint stated a joint cause of action against the two defendants and that the directed verdict for one defendant released appellant. This court, however, rejected this contention in Great Atlantic & Pacific Tea Co. v. Traylor, 239 Ala. 497, 195 So. 724, 728, wherein this court said:

> "A tort charged to have been committed by two persons is several as well as joint, unless the liability of one is because of his responsibility for the act of the other instead of for his own act."

See also Liberty National Life Ins. Co. v. Weldon, 267 Ala. 171, 100 So.2d 696, 61 A.L.R.2d 1346.

There are 110 assignments of error. We have carefully considered all of them but see no reason for prolonging this opinion by discussing the assignments of error not considered in this opinion since we find no merit in them.

We conclude that the ground of the motion for new trial charging excessiveness of the verdict was well taken. Accordingly a judgment will be entered here that unless the appellee files with the clerk of this court a remittitur within thirty days reducing the judgment to $45,000, the judgment of the trial court will stand reversed. If such remittitur is duly filed the judgment for $45,000 with interest from the date of the judgment in the circuit court will stand affirmed. See Daniel Construction Co. v. Pierce, 270 Ala. 522, 120 So.2d 381.

Affirmed conditionally.

LIVINGSTON, C. J., and LAWSON and MERRILL, JJ., concur.