## The Banner Publishing Company *et al., v.* The State.

1. CRIMINAL LAW. *Libel.* Upon indictment for libel charging officers of the State prison with abuses, evidence as to abuses prior to the appointment of said officers, is incompetent.

2. SAME. *Same. Evidence.* It is the duty of the court to tell the jury whether a publication is *prima facie* libelous or not, but whether the defamatory matter was published concerning any particular individual, or whether that individual was intended, is a question of fact for the jury.

3. SAME. *Same. Privileged communications.* Neither the public press nor individuals can discuss the conduct and character of officers and candidates for office, without incurring liability, civil or criminal, for defamatory utterances published, although such publications may be made without malice and upon probable cause.

### FROM DAVIDSON.

Appeal in error from the Criminal Court of Davidson County. N. W. McCONNELL, J., sitting by interchange.

TULLY BROWN, T. E. MATTHEWS and C. D. PORTER for Banner Company.

ATTORNEY-GENERAL LEA and JNO. V. WRIGHT for the State.

COOPER, Sp. J., delivered the opinion of the court.

The indictment in this case charges the defendants with libel. There are three defendants, the Banner Publishing Company (a corporation), A. L. Landis, Jr., and G. H. Baskette. The article on which the indictment is based, was published in the Nashville *Banner* on January 26, 1885, and at that time Landis and ˙Baskette were the editors and publishers of the newspaper. The alleged defamatory article is entitled "The Tennessee Tewksbury," and deals with the State prison and its management. There are four counts in the indictment. The first charges the publishing company with libeling Jas. E. Carter, F. S. Harris, and Deering J. Roberts, they being, respectively, the superintendent, warden and physician of the penitentiary.

The second count charges defendants Landis and Baskette with a like offense.

The third count charges the publishing company with libeling Deering J. Roberts; and the fourth charges Landis and Baskette with a like crime.

The jury returned a verdict of guilty against all the defendants, and assessed their fine at fifty-one dollars. His Honor, Judge McConnell (sitting by interchange with Judge Allen), overruled the motions in arrest of judgment and for new trial, and entered judgment, and defendants bring the case to this court in the usual mode.

If the charge of the court is correct, it is not seriously insisted that the verdict is not sustained by the evidence. It is therefore not necessary to refer

12—VOL. 16.

to the evidence and the publication complained of at length. It is sufficient to say of the publication, that it vigorously denounced the management of the State prison, and the abuses alleged to be incident thereto, and imputed the grossest dereliction of duty, if not positive crime, to its officials, or to some of them. It is not insisted here that the publication was not libelous, if the court below was correct in its rulings upon the evidence, and in the charge to the jury.

His Honor ruled that no· evidence could be introduced as to abuses existing in the prison prior to the terms of the officials incumbent when the publication was made. This he did for the reason that the article was written in the "present tense," and showed on its face that it was leveled against *existing* abuses. Under these circumstances, he thought the line should be drawn with the beginning of the terms of the incumbent officials; that they were, in no sense, responsible for acts occurring under their predecessors; that if the line was not drawn somewhere, evidence could be introduced of what occurred from the origin of the penitentiary. These incumbents, Carter, Harris and Roberts, had been officers of the prison about two years when this publication was made, one of them something less than that time. Defendants insist that this ruling was erroneous, but we do not see that his Honor committed any error in this respect. The publication was addressed to abuses then existing, or alleged to exist, and in justification of the publication, it certainly would not be relevant to prove what existed many years before, under some admin-

istration of the prison with which the complaining witnesses were not connected.   Whether this testimony, in our. view, was competent from another standpoint, will appear further on.

It is argued by the counsel of defendants, that the court erred in charging the jury that if they found, from the proof, certain things to be true, then the publication would be *prima facie* a libel.   The court told the jury that they would examine all the proof and ascertain whether the publication meant the prosecuting witnesses, and if it did it would be *prima facie* a libel.   As an illustration of the character of the charge on this subject, we quote from it.   After telling the jury they must look to all the proof to ascertain who was meant, etc., his Honor adds:   "If it means to impute *cruelty* and inhumanity to the prosecuting witnesses, then you are to consider it, with all the rest of the article, in determining whether defendants are guilty.   To charge them with having murdered the convicts, and with not treating them as human beings, would be *prima facie* libelous."   This quotation furnishes a fair sample of the other portions of the charge bearing upon this question, and there is no error in this instruction.   It is generally laid down in the authorities, that it is the province of the court to tell the jury whether a publication is *prima facie* libelous or not; to determine the construction of the language published, and say whether or not, upon its face, it is actionable or indictable *per se:*   Townsend on Slander and Libel, sec. 286, and authorities there cited; *Palmer* v. *Concord,* 48 N. H., 216; *Lynn* v.

*Guild,* 5 Heis., 183; Stephens on Plead., 382; *Williams* v. *Norwood,* 2 Yer., 330.    But on a plea of not guilty, whether the defamatory matter was published concerning any particular individual, or whether that individual was intended, is a question of fact for the jury:  Townsend on Slander and Libel, sec. 286. In this case, the court particularly instructed the jury that they must determine, from all the proof, whether the article was published of the prosecuting witnesses, and whether they were meant to be referred to.  He also charged that the jury were the judges of the law, as in other criminal cases.  His Honor did not usurp the special province of the jury, to-wit, to determine the facts; and on the points complained of by the defendants, as above indicated, he was clearly within the limits of his authroity.

It is the duty of the court, as a general rule, to construe any written or printed instrument or paper offered in evidence.  This was expressly so held by this court, at its present term, in the case of *Gallatin Turnpike Company* v. *The State,* 16 Lea, 36.    In that case, the controversy was, whether a certain bridge was within or without the territorial limits of the town of Gallatin.    The circuit judge had left the fact to the jury, without construing the act defining the limits of the town.    It was holden that he should have construed the act and told the jury where it fixed the boundaries of the town.

But the main point urged by defendants for a reversal is, that the publication in question, as a matter of law under the facts, was privileged, and that the

Banner Publishing Company *v.* The State.

court below refused to so charge the jury, but, on the contrary, expressly charged that the law of privileged communications, or communications "conditionally privileged," did not apply to this case. And this brings us to the consideration of the most serious question in the case; a question, the grave importance of which, we fully appreciate. The contention is, that the public press and individuals can discuss the conduct and character of officers and candidates for office, without incurring liability, civil or criminal, for defamatory utterances published, provided such publications are made without malice, and upon probable grounds. If this be true, the charge of his Honor to the jury in the trial court is erroneous.

The nineteenth section of our bill of rights is this: "That the printing presses shall be free to every person to examine the proceedings of the Legislature, or of any branch or office of the government; and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of men, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty. But in prosecutions for the publication of papers investigating the official conduct of officers or men in public capacity, the truth thereof may be given in evidence, and in all indictments for libel, the jury shall have the right to determine the law and the facts, under the direction of the court, as in other criminal cases."

Whatever rights and privileges are reserved and secured to the citizen under this provision of the organic

law must be sacredly preserved. But it has not been insisted directly, that the right contended for by the defendants is secured to them by our Constitution, but rather by the law of libel, correctly understood, expounded and applied. Still, we have set out this provision of the declaration of rights as a land-mark to guide us in reaching a just and true view of the subject under consideration. If we see that we are infringing upon rights therein reserved, we may well pause. On the contrary, if we see that the invaluable privileges there guaranteed are not encroached upon, but still remain intact and unimpaired in their integrity, we may feel, at least, that the freedom of the press and free speech still exist in their constitutional strength and vigor, and that we have not reached a conclusion subversive of the fundamental rights of the citizen.

The law of libel on the subject of privileged communications, is involved in considerable uncertainty. There is more of conflict and doubt than on many other questions affecting personal rights. It is very easy to determine that certain communications are privileged, as it is called, but we soon reach a point where doubt and uncertainty begin, and here we must proceed with caution and due deliberation, lest we declare what is fallacious in principle, and establish precedents destructive of individual rights and injurious to the public welfare.

In this State, we have no decision directly upon the point at issue in the case before us, and we are left to adopt whatever rule (within the limits of the

Constitution) that appears to us to be best sustained by reason. And especially do we feel at liberty to pursue this course, as we find no well established line of cases settling the law upon this question, but rather conflict and discord, in the decisions of other courts.

In the law of libel we find the expressions "privilege," "absolute privilege," "conditional privilege," in reference to communications. We note that these expressions are rarely coupled with the word publication. We will not attempt to define, fully, all that is reasonably meant by these different expressions. If a man has the right, under the established law, to make a communication, then it is "privileged;" and, usually, he does not incur liability, civil or criminal, *per se,* for defamatory matter contained therein. Often this privi'ege is conditional upon the communication being made *bona fide* and without malice, and upon probable cause, and there must be proper occasion for the communication. If there is bad faith and malice, and the occasion does not call for the communication, liability ensues in this class of cases said to be conditionally privileged. If the communication is one of absolute privilege no liability ensues, even if there is express malice and bad faith. But the tendency of the law, at present, is to narrow the right of absolute privilege, and to make all such communications conditionally privileged, but with varying conditions, according to the exigencies of the case: *Rucks* v. *Baker,* 6 Heis., 397; *Saunders* v. *Baxter,* 6 Heis.; 370.

The litigants in a law-suit are privileged to speak freely as to their rights, without incurring liability.

So a witness upon the stand must not be hampered by the fear of suits for slander, and counsel in argument must, in like manner, be privileged. And if a public officer hold his place by appointment of a single man, who is vested with the power of removal, a petition or communication, addressed to the appointing power and asking the removal of the subordinate, is privileged, and the publishers thereof are not liable for any defamatory statements contained in the communication, if made *bona fide,* without malice, and upon reasonable grounds.

These instances are given as fair illustrations of the doctrine of privileged communications. It is urged that this doctrine is applicable to publications in the press concerning public officers, whether appointed or elected by the popular vote, the officers of the State prison above named, under the law, being appointed by the Governor of the State.

It is admitted that the conductor of a public journal has, in this respect, no more rights than the private citizen, the authorities all sustaining this view. As the facilities of the press for the dissemination of its publications are so great, and its power so extended, it seems reasonable that its rights in this regard should, at least, be bounded by the same limits as are the rights of individuals.

Comparatively few direct authorities can be found sustaining the view, in all its breadth, contended for by defendants. We have been furnished, by counsel, with the full report of only one case of a newspaper publication sustaining, substantially, the position insisted

on for defendants. This is the case of *Palmer* v. *City of Concord*, 48 N. H. Rep., 217. This case contains a very brief and unsatisfactory discussion of the reason of the rule contended for, and other decisions of that State, cited and quoted from in the opinion, indicate that even there the rule is not thoroughly established. In the opinion it is left somewhat uncertain just what rule or principle is laid down, as well as where the burden of proof is in such cases—whether upon the plaintiff to show the absence of good faith, and the lack of probable cause on the part of the publisher, or on the defendant to show the existence of a *bona fide* intent and reasonable grounds. In a manuscript opinion of the Supreme Court of Pennsylvania, furnished us by defendant's counsel, the position assumed is more logical and consistent, whether it is warranted as a sound exposition of the law or not. This opinion is in the case of *Briggs* v. *Garrett*, and was filed January 25, 1886. In it is contained this language: "An action for libel is upon all fours with an action for a malicious prosecution. The latter is but an aggravated form of an action for libel, as in it the libel is sworn to before a magistrate. * * And if probable cause exists in either case, the question of malice becomes of no importance." In a note to the case of *Dodge* v. *Brittain*, Meigs' Rep., 87, the learned reporter says, that in an action for malicious prosecution, the burden of proof is on the acquitted defendant to show that he was prosecuted without probable cause, and this statement is sustained by the authorities as well as by reason. In a State case, the fact that the

jury returned a verdict of not guilty, of course does not prove, logically, that there was no probable ground for the prosecution. Under the case of *Briggs* v. *Garrett,* it follows that in a libel case for defaming a public officer, or a candidate, the *onus* is on the plaintiff to prove that the publication was made *mala fide* and without probable cause. If the communication is privileged, the law ought to, and does presume, in the absence of further proof, that it was made in good faith and upon reasonable grounds, just as the inference is that a suit is prosecuted with proper motives, and upon good grounds, until the contrary is made to appear: Townsend on Slander and Libel, sec. 209; *White* v. *Nicholls,* 3 Hum., 266. This conclusion naturally follows the right of privileged communication.

As the case referred to of *Briggs* v. *Garrett* is greatly relied on by defendants, we desire to notice it further. Briggs was an associate judge of the court of common pleas for the county of Philadelphia, and a candidate for re-election. Garrett was a member of the "committee of one hundred," a voluntary association formed to prevent abuses in the city government. Before this committee, and in the presence of reporters for the press and others, Garrett read a letter from a "reputable citizen" named Laregrove containing this statement: "The Hart Creek sewer steal of $200,000 was only made possible by Judge Briggs' charge to the jury. See the charge and reflect on the facts." It turned out that Judge Briggs did not preside in the trial of the cause referred to; that it was not even tried in his court. It is stated

Banner Publishing Company *v.* The State.

in the opinion, that Judge Briggs was a man of exceptionally high and unblemished character, and the defamation was wholly unfounded.    Garrett knew nothing of the matter except what was stated in the letter. But the writer, Laregrove, was said to be a "reputable citizen," and the court held that Briggs was without redress in the courts, and as a good citizen, he must endure the defamation.    In one paragraph the opinion says:  "But this is the sacrifice which the individual must make for the public good, just as the soldier is shot down in battle to preserve for others the blessings of free government."

It is to be noted that in this case of *Briggs* v. *Garrett*, three of the seven members of the court, including the Chief Justice, refused to concur in the decision of the majority, and filed a dissenting opinion. It is, in few instances, that the courts have been disposed to give the doctrine of privileged communications so wide an application as in the case above referred to.    What are the just limits of this doctrine? The freedom of the press must be preserved, but is it the lawful right of the press to publish incriminatory and defamatory utterances of public officials or candidates for office, and then to say to the aggrieved party, "we are privileged to do this.  If you think we have defamed your character you can sue us in the civil courts, or prosecute us for crime, and if you can show that we had no probable cause for publishing this libel, then we are amenable, and only then.    When you institute such proceeding we will show on what ground we based our defamation."    If

such suit was instituted in order to exculpate themselves, the defendants would only be required, after the plaintiff had made out a *prima facie* case, to show that the libelous article was based upon information given by a "reputable citizen," whose veracity they had no just reason to question, as upon other similar facts. How often would the injured party, under a rule like this, have the hardihood to resort to the courts for his vindication? He would be tempted, rather, to take the law into his own hands and resort to violence. And this privilege contended for, be it remembered, would not be restricted to the press, but would extend to the entire body of voters. If this rule were firmly established, it is easy to suppose that it would soon be greatly abused in the heat of partisan strife, and in the contests of conflicting interests.

If such an application of the law would best subserve the public welfare, then we should not hesitate to so apply it. But if the contrary is true, this application of the principle should be refused. To the thoughtful man, it is evident that a new epoch is upon us. No one can correctly divine the future. Just what phases may present themselves in the future life of the State, it is not given us to know. The principle we are asked to accept and apply, would be, if so applied, one of far reaching importance. The public good demands that the demerits of aspirants for office should be made known, and that dishonesty and corruption in public places should be unsparingly exposed. It likewise demands that the purest and ablest men should be attracted to the public service, and that

they be not deterred by fear of unjust defamation and groundless misrepresentation.    Merit is often sensitive and retiring, while demerit is frequently found clothed upon by an effrontery on which the shafts of ridicule and denunciation fall with insensible effect.    If we could know that none but honest and pure men would ever aspire to office, or administer public trusts, then we could easily declare a rule on the question under consideration.    Or, if we could know that every con-- ductor of a newspaper and every voter would be honest and sincere and temperate, we could as easily declare a rule or make the application of a principle. But unworthy men will be found among the aspirants for office, and among those chosen for the public service.    And no doubt unworthy men are sometimes found among the conductors of the public press. Whether the public service will become purer or less pure in the future cannot be foretold, and the same is true of the public press.    Influential journals may fall into the hands of men who will conduct them for selfish purposes and not for the public good.    Any man with sufficient means can establish a newspaper under his own control, and thus add to his power as a citizen.    If the rule contended for was the settled law of the land, the life of any officer possessing reasonable self-respect could easily be made intolerable. The press itself could be imposed upon by designing men, and made the innocent instrument of defamation.

The Pennsylvania court reasons that if a suitor may libel another in a court, and then exonerate himself by proving that he had probable grounds for the

prosecution, then a party in a case like the one under consideration should have the right to make a like defense. But the analogy is by no means complete.

A party will not often be willing to incur the expense and trouble of a suit, brought without probable cause, and merely to vent his malice. If he becomes a prosecutor in a State case, and it is developed that the prosecution is malicious or frivolous, he is at once taxed with the cost. If he wrongfully institutes a civil suit, the costs are adjudged against him. This penalty he has to pay, as well as take the risk of his victim bringing an action for malicious prosecution. And the bringing of a suit is naturally a matter of deliberation. A party is not likely to take such a step hurriedly and inconsiderately, and often a little judicious reflection will turn the currents of rashness or malice into more pacific channels. And then the occasions furnishing pretexts for malicious suits would not be so frequent. These reasons, or most of them, would not apply to defamatory publications. Another reason for the difference, which seems conclusive to the writer, is this: it is absolutely necessary to keep the courts open to suitors, and we can not deny this privilege, because some suitor may mistake his ground of action. All these reasons, we think, clearly show the fallacy of the position of the Pennsylvania court (whose opinion is urged upon our consideration), that because a man may solemnly libel another in a suit in court, and then justify upon probable grounds, that a like right should be accorded to parties publishing defamatory articles concerning candidates and

-officers. Such publications would probably be much more frequent than the prosecution of wrongful suits.

It is urged that the charge of his Honor below, on the point being considered, does not recognize the progress of the age in the law of libel, and is fashioned upon antiquated rules. We are aware of the fact that the law of libel has not always kept pace with other branches of the science, and that in the latter part of the last century it tasked the eloquence and genius of Erskine and Fox to establish needed reformations. But we fail to perceive that there exists now such glaring defects, or crying abuses, as were patent them. Indeed, it seems to us, that the liberty of the press is not narrowly restricted. Public officials fully appreciate its power. The truth of a defamatory charge can be shown in justification. This did not become the law of England until the act of 6 and 7 Victoria, and then with restrictions, and Fox, in his speech on his libel bill, said he was not ready to say that this should be the law. In a criminal case, on a plea of justification, practically the defendant is acquitted if he can prove that there exist probable grounds to believe the publication true, for this is sufficient to generate a reasonable doubt of the defendant's guilt. The law was so charged, in substance, in this case, and in this respect the charge is consistent with the principles laid down in the case of *Dove* v. *State*, 3 Heis., 367, and *Coffee* v. *State*, 3 Yer., 283.

If a publication is made *bona fide* and without malice, even though the truth can not be shown, our courts and juries are not disposed to be severe with

offenders.    Every  one  knows  how  loth  men  are,  as  a
rule,  to  resort  to  the  courts  for  the  vindication  of
character,  and  slander  and  libel  suits  are  seldom  brought
unless  there  exists  strong  provocation.    For  the  repose
of  society,  statutes  of  limitation  are  enacted  that  furnish
a  speedy  bar  to  actions  of  this  class,  and  properly  so.
This  fact  is  another  reason  why  a  defendant  should
not  be  permitted  to  justify  by  showing  that  the  in-
formation  on  which  he  acted  furnished  probable  grounds
for  the  publication.    Before  the  aggrieved  party  could
prosecute  to  a  termination  his  suit  against  the  public
offender,  his  right  of  action  against  the  other,  furnish-
ing  the  information  to  the  publisher,  would  be  barred
by  the  statute.

We  do  not  see  that  his  Honor  below  committed
any  error  of  which  the  defendants  can  complain,  and
the  judgment  must  be  affirmed.