## EARL A. McNABB, Plaintiff in Error, v. TENNESSEAN NEWSPAPERS, INC., Defendant in Error.—400 S.W.(2d) 871.

Eastern and Western Sections, En Banc. June 22, 1965.

Certiorari Denied by Supreme Court March 7, 1966.

Petition to Rehear Denial of Certiorari Denied by Supreme Court April 4, 1966.

William Waller, D. L. Lansden, and Kenneth L. Roberts, Nashville, Waller, Lansden & Dortch, Nashville, of counsel, for plaintiff in error.

John Jay Hooker, Jr., and William R. Willis, Jr., Nashville, Hooker, Hooker & Willis, Nashville, of counsel, for defendant in error.

BEJACH, J.  This cause, before the Middle Section of the Tennessee Court of Appeals by appeal in the nature of a writ of error, was transferred to the Eastern Section of the Court of Appeals at Knoxville, where it was heard by the Eastern Section and the Western Section sitting en banc; and same is now disposed of by this opinion. In this opinion, the parties will be referred to, as in the lower court, as plaintiff and defendant.

The cause involves a libel suit by Earl A. McNabb, Chairman of the Davidson County Democratic Primary Board, against the Tennessean Newspapers, Inc., growing out of four separate publications made in the Nashville Tennessean, a morning newspaper published in Nashville, Tennessee, by the defendant.  The articles claimed to be libelous appeared, during the month of

August 1962, as news stories and editorials They dealt with conduct of the plaintiff, in connection with his duties as Chairman of said Davidson County Democratic Primary Board, in matters relating to the primary election held August 2, 1962. Charges made by the defendant were based on the theory that the primary election board had the right and duty to pass on the validity of absentee ballots offered to be cast or permitted by the precinct officials to be cast for candidates for the Democratic nomination for Congressman. Plaintiff, through his counsel, served notice, pursuant to section 23-2605 T.C.A., specifying and alleging that the statements complained of were false and defamatory and libelous in character, thus giving to defendant the opportunity and privilege of retraction; but the defendant ignored this notice.

In its publication of August 9, 1962, plaintiff was charged with having been intent upon validating the worst sort of election day farce, with having made admissions that ought to send him packing into permanent retirement, head hung in shame, and with having falsely signed a certification of absentee ballots without so much as a cursory check of the points required by law, and with demonstrating what he, a lawyer thought of the law, by turning his back on it.

In its publication of August 10, 1962, plaintiff was charged with permitting another breach of trust and with lacking courage, with deserving the brunt of public resentment and public reaction and with being guilty of shameful dereliction of duty and disgracing Nashville.

In its publication of August 14, 1962, plaintiff was charged with committing a shameful travesty on justice, with compounding errors and fraud by placing the stamp of approval on election manipulations, with being cow-

ardly, with running from responsibility, oath of office and plain duty, with ignoring every provision of the election laws, and attempting to throw the mantle of decency over a scheme of corruption and fraud at the ballot boxes, with forcing the mark of legality on fraud clouded absentee ballots, and with counting one candidate into a race he had lost, by not casting aside votes tainted with fraud.

In its publication of August 23, 1962, referring to a resolution adopted by the State Democratic Executive Committee which commended the members of the Primary Board and expressed regret at the unjust criticism they had received, the defendant published the statement that a member of that Committee had, "best sized up the resolution by saying, 'It's time to quit giving medals to election thieves' '', whereas, this language had actually been used in a different context and not with reference to the commendatory resolution.

Plaintiff's contention, both at the trial in the lower court, and in this court, was and is, that he, and the board of which he was chairman, had merely ministerial duties with respect to the absentee ballots in question, and, whether such ballots were legal or illegal, had no right to judge them or throw them out, or to review the action of the precinct judges. We think this contention is correct, and in accordance with the laws of this State.

Prior to the election on August 2, 1962, the Primary Board had delivered ballots for the primary election which had been sent to it, to the commissioners of election, who took them, together with the ballots for the general election, to the precinct polling places, where the registrars were required by section 2-314 T.C.A. to have with them at the polls the permanent registration cards

showing the signatures of the voters, which were to be compared with the signatures on the envelopes containing the absentee ballots, as provided for in sec. 2-1609 T.C.A.

In the late afternoon of August 2, 1962, Mr. George Barnett, a Nashville attorney, on behalf of Charles Galbreath, a candidate for Public Defender in the general election, and a candidate for nomination as Representative for Davidson County in the Tennessee General Assembly in the Democratic Primary Election, filed two petitions in the Chancery Court. In one of these petitions, he sought an injunction against the Commissioners of Election and their appointees to prevent the counting of absentee ballots in the Second Ward in the general election; and in the other, a similar injunction was sought with respect to absentee ballots in the Second Ward in the primary election. Chancellor Alfred T. Adams issued stay orders which had the effect of stopping the counting of ballots, and notified the parties of hearings to be had on applications for injunction at 9:00 A.M., Monday, August 6, 1962. As a result of the stay order issued in response to the petition involving the primary election, the Second Ward primary election officials were unable to certify the results and accordingly brought in to plaintiff, as Chairman of the Primary Board, the incompleted election material, including poll books, tally sheets and absentee ballots. Some of the envelopes containing absentee ballots had already been opened and the ballots counted before notice of the stay order, and these ballots, together with the accompanying envelopes, were delivered to plaintiff, along with the envelopes which had not been opened. Plaintiff gave each precinct official a receipt for the material delivered to him, and made arrangements for the safekeeping and guarding of the material pending the court hearing. None of the absentee ballots

challenged in the petition had been challenged at the polls.

Informal checks demonstrated that Mr. Galbreath had been elected to the office of Public Defender in the general election, without regard to the Second Ward absentee ballots, and that he had become a Democratic nominee for Representative from Davidson County in the Tennessee General Assembly. He thereupon dismissed his suits in the Chancery Court and the stay orders were dissolved. It developed, however, that the contest between Congressman Loser and his opponent, Mr. Fulton, for the Democratic nomination for that office would depend on the Second Ward absentee ballots. The defendant opposed Congressman Loser, and supported his opponent, Fulton. The publications referred to above, with reference to alleged misconduct of plaintiff, were made by defendant in connection with its support of Fulton and opposition to Loser.

On the day after the election, Friday, August 3, 1962, Mr. Galbreath, through his attorney dismissed his petition relating to the general election, but not until Monday morning, August 6, 1962, when the Chancery Court convened, did he dismiss his petition relating to the primary election.

Following the conclusion of the Chancery Court hearing plaintiff convened the Davidson County Primary Election Board. It decided to make a recheck of the machine vote in the Second Ward. This recheck revealed that after correcting certain errors, the outcome of the congressional race would depend on the absentee ballots, most of which had, presumably, been marked in favor of Congressman Loser. Subsequent meetings were held, and plaintiff, as chairman of the Primary Board, permitted

Mr. Barrett, representing Fulton, to talk at length in his behalf and to argue his conception of the Board's duties with respect to the absentee ballots. Mr. Cecil Branstetter, representing Mrs. Houk, a member of the Primary Election Board, was also permitted to make speeches along the same line. Plaintiff and Mr. Gilbert, Secretary of the Primary Election Board, attempted to explain to those present, including representatives of the defendant, with citation of authorities, that the Board had merely ministerial duties and had no choice but to return to the precincts the election material for which plaintiff had receipted and let the law take its course.

The Board, after listening to the speeches, voted to schedule staggered meetings at the various precincts on August 9, 1962, where Mr. Fulton could, in an orderly way, challenge each and every absentee ballot which had not previously been opened and counted. The precinct officials rejected some of the ballots, for various irregularities, but counted most of them, preserving the necessary evidence for a contest. The election returns were then duly certified to the Board and the Board, after holding additional public hearings on August 11, 1962, and August 13, 1962, duly certified the returns to the State Democratic Executive Committee whose duty it was to pass upon any election contest which might be filed. Mr. Fulton filed an election contest which was heard before the State Democratic Executive Committee on August 22, 1962, when and where it was decided to certify no nominee for Congress, but to permit both Mr. Loser and Mr. Fulton to run as independent candidates in the November election.

After voting to certify no nominee, the State Committee adopted a resolution with respect to the activities of

the Davidson County Primary Election Board, which was, as follows:

"WHEREAS, certain attacks have been unjustly made against the action of members of the Davidson County Democratic Primary Board because they refused to open the absentee ballots and count and tally the same, because they refused to determine the validity or invalidity of votes cast, because they refused to 'throw out' certain votes from the returns received by them from the precinct election officials and because they refused to eliminate votes from these returns in their transmittal of the returns to the Secretary of State, and

WHEREAS, according to the statutes of the State of Tennessee, the opinions of the courts on these matters and the judgment of lawyers, they were compelled to make these refusals.

NOW, THEREFORE, BE IT RESOLVED by this Board that we do commend these members of the Davidson County Primary Board for their actions in these regards and express our regrets at the unjust criticism they have received."

It was against this background that the editorials and news articles alleged to be libelous were printed. These articles, alleged to be libelous, are before us in full; but, we deem it unnecessary to copy them into this opinion. They do contain inaccuracies, and in some respects are false. Under decisions of the Supreme Court of Tennessee, rendered prior to the decision of the Supreme Court of the United States in the case of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed(2d) 686, they would have been considered libelous per se, and

plaintiff might have been entitled to recover substantial damages, without specific proof of such damages, and without proof of actual malice on the part of defendant.

Following a ruling that the plaintiff's declaration, as originally filed, was duplicitous, because more than one article in the same issue of defendant's newspaper was declared upon in a single count, the plaintiff filed an amended declaration. The amended declaration is in seven counts. To this amended declaration, defendant filed a plea of not guilty, with notice of special defenses. Plaintiff moved to strike the notice of special defenses, such practice of notice having gone out with the 1932 Code; whereupon, the defendant refiled the same defenses in the form of special pleas, which, in the main, merely elaborated on the plea of not guilty. In addition to the special pleas which raised defenses already embodied in the plea of not guilty, the defendant filed a special plea which purported to be a plea of justification, which special plea is in the words and figures, as follows:

"For further plea the defendant enters a plea of justification, in that each and every statement of fact contained in its publications which says that the Primary Election Commission violated its statutory duty by turning uncertified ballots over to the precinct officials was true."

It is the contention of plaintiff that since he had not moved for special pleas, such special pleas were improper and should have been stricken. The trial judge, however, declined to strike them and permitted them to be read to the jury.

At the conclusion of all of the evidence, both plaintiff and defendant moved for directed verdicts. Defendant's

motion for a directed verdict was general as to all counts of the declaration, and specific as to each of them. The court overruled the plaintiff's motion in its entirety, and granted the defendant's motion as to counts 5 and 6 of the declaration, but overruled same as to all other counts of the declaration. The Court submitted to the jury the issues with reference to counts 1, 2, 3, 4 and 7. The jury returned a verdict in favor of the defendant on all counts submitted to it. The plaintiff filed and presented his motion for a new trial, which was overruled; after which, an appeal in the nature of a writ of error was prayed and perfected to the Middle Section of the Tennessee Court of Appeals.

In this Court, as plaintiff in error, plaintiff has filed twenty-two assignments of error. We deem it unnecessary to take up these assignments of error separately, or to discuss them in detail. Assignments of Error I and II complain of the failure of the trial judge to instruct the jury specifically as to plaintiff's duties and to distinguish between the duties of the Primary Election Board and the precinct officers. Assignments of Error III, IV, V, VI, VII, IX, X, XI and XII complain of the refusal of the trial judge to give to the jury special instructions requested by plaintiff. Assignment of Error VIII complains that the trial judge left to the jury the question of whether or not the articles published by defendant were libelous, instead of ruling as a matter of law that they were libelous. Assignments of Error XIII and XIV complain of the granting by the trial judge of peremptory instructions as to counts 5 and 6 of plaintiff's declaration. Assignments of Error XV, XVI, XVII, XVIII, XIX and XX complain of the admission by the trial judge of evidence tendered on behalf of defendant and of exclusion of evidence tendered on behalf of plaintiff.

Assignments of Error XXI and XXII complain of the failure of the trial judge to strike defendant's special pleas and in particular, defendant's special plea of justification.

After this case had been tried in the lower court, but while it was pending in that court on plaintiff's motion for a new trial, the Supreme Court of the United States announced its decision in the case of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed. (2d) 686. In our opinion, that case is determinative of the litigation in the instant case; and, if it had been announced sooner, it might have simplified the trial of the instant case. In the Sullivan case, the Supreme Court of Alabama had upheld a verdict against the New York Times for libel of the plaintiff, Sullivan, a public official of the city of Montgomery, Alabama. The Supreme Court of the United States, however, reversed the judgment, holding that, under the provisions of the First and Fourteenth Amendments to the Constitution of the United States guaranteeing freedom of speech and freedom of the press, a public official could not recover against a newspaper for a libelous publication, even though it was false in fact, unless he proved actual damages, and actual malice on the part of the newspaper.

As stated above, prior to the decision in the case of New York Times Co. v. Sullivan, the law in Tennessee was that, in such cases, actual damages and malice would be presumed if the libelous statement was false. Cases so holding include Brewer v. Weakley, 2 Tenn. 99; Williams v. Karnes, 23 Tenn. 9; Haws v. Stanford, 36 Tenn. 520; Banner Pub. Co. v. State, 84 Tenn. 176, 57 Am.Rep. 216; Continental National Bank of Memphis v. Bowdre, 92 Tenn. 723, 23 S.W. 131; Stair v. Journal &

Tribune Co., 136 Tenn. 404, 189 S.W. 864; Hinson v. Pollock, 159 Tenn. 1, 15 S.W.(2d) 737; Jones v. Fleming, 198 Tenn. 407, 280 S.W.(2d) 927; Langford v. Vanderbilt University, 199 Tenn. 389, 287 S.W.(2d) 32; State v. Guinn, 208 Tenn. 527, 347 S.W.(2d) 44; and Saunders v. Baxter, 53 Tenn. 369.

■ In the light of the U. S. Supreme Court's decision in New York Times Co. v. Sullivan, however, we think that all of plaintiff's assignments of error must be over-ruled. Prior to the Sullivan case, many of these assignments of error would have presented serious problems. Since that decision, inasmuch as it was rested on constitutional grounds, and since we are bound in questions involving the Constitution of the United States by decisions of the U. S. Supreme Court construing that document, and since it is clear, on the record before us, that the plaintiff did not prove either actual damages to himself, nor actual malice on the part of the defendant, all rulings of the trial court complained of, even if erroneous, would constitute, under the provisions of sections 27-116 and 27-117 T.C.A., harmless error. In the light of the Supreme Court's ruling in the Sullivan case, we are inclined to the view that defendant's motion for a directed verdict on all counts of plaintiff's declaration should have been granted. At most, there might have been for the jury, in the instant case, the question of whether or not false or erroneous statements made in the articles published by defendant, were made with knowledge of their falsity or reckless disregard of whether or not same were false or true. Since the issues were in fact submitted to the jury, however, in the instant case, and since the jury's verdict was in favor of the defendant, we are of opinion that the verdict settles that issue, and we think

the judgment based on that verdict must, on authority of New York Times Co. v. Sullivan, be affirmed.

We quote at length from the opinion of the Mr. Justice Brennan in the case of New York Times Co. v. Sullivan, as follows:

"It is uncontroverted that some of the statements contained in the two paragraphs were not accurate descriptions of events which occurred in Montgomery.

\* \* \* \* \* \*

On the premise that the charges in the sixth paragraph could be read as referring to him, respondent was allowed to prove that he had not participated in the events described. Although Dr. King's home had in fact been bombed twice when his wife and children were there, both of these occasions antedated respondent's tenure as Commissioner, and the police were not only not implicated in the bombings, but had made every effort to apprehend those who were. Three of Dr. King's four arrests took place before respondent became Commissioner. Although Dr. King had in fact been indicted (he was subsequently acquitted) on two counts of perjury, each of which carried a possible five-year sentence, respondents had nothing to do with procuring the indictment.

Respondent made no effort to prove that he suffered actual pecuniary loss as a result of the alleged libel. One of his witnesses, a former employer, testified that if he had believed the statements, he doubted whether he 'would want to be associated with anybody who would be a party to such things that are stated in that ad,' and that he would not re-employ respondent if he believed 'that he allowed the Police Department to

do the things that the paper said he did.' But neither this witness nor any of the others testified that he had actually believed the statements in their supposed reference to respondent." New York Times Co. v. Sullivan, 376 U.S. 258, 260, 84 S.Ct. 710, 714, 11 L.Ed. (2d) 686.

On page 267 of 376 U.S., on page 719 of 84 S.Ct., Justice Brennan's opinion continues:

"Under Alabama law as applied in this case, a publication is 'libelous per se' if the words 'tend to injure a person * * * in his reputation' or to 'bring (him) into public contempt'; the trial court stated that the standard was met if the words are such as to 'injure him in his public office, or impute misconduct to him in his office, or want of official integrity, or want of fidelity to a public trust * * *.' The jury must find that the words were published 'of and concerning' the plaintiff, but where the plaintiff is a public official his place in the governmental hiearchy is sufficient evidence to support a finding that his reputation has been affected by statements that reflect upon the agency of which he is in charge. Once 'libel per se' has been established, the defendant has no defense as to stated facts unless he can persuade the jury that they were true in all their particulars. Alabama Ride Co. v. Vance, 235 Ala. 263, 178 So. 438 (1938); Johnson Publishing Co. v. Davis, 271 Ala. 474, 494-495, 124 So.(2d) 441, 457-458 (1960). His privilege of 'fair comment' for expressions of opinion depends on the truth of the facts upon which the comment is based. Parsons v. Age-Herald Publishing Co., 181 Ala. 439, 450, 61 So. 345, 350 (1913). Unless we can discharge the burden of proving truth, general damages are presumed, and may be awarded

without proof of pecuniary injury. A showing of actual malice is apparently a prerequisite to recovery of punitive damages, and the defendant may in any event forestall a punitive award by a retraction meeting the statutory requirements. Good motives and belief in truth do not negate an inference of malice, but are relevant only in mitigation of punitive damages if the jury chooses to accord them weight. Johnson Publishing Co. v. Davis, supra, 271 Ala., at 495, 124 So.(2d) at 458.

The question before us is whether this rule of liability, as applied to an action brought by a public official against critics of his official conduct, abridges the freedom of speech and of the press that is guaranteed by the First and Fourteenth Amendments.

\* \* \* \* \* \*

In deciding the question now, we are compelled by neither precedent nor policy to give any more weight to the epithet 'libel' than we have to other 'mere libels' of state law. N.A.A.C.P. v. Button, 371 U.S. 415, 429 [83 S.Ct. 328, 9 L.Ed.(2d) 405]. Like insurrection, contempt, advocacy of unlawful acts, breach of the peace, obscenity, solicitation of legal business, and the various other formulae for the repression of expression that have been challenged in this Court, libel can claim no talismanic immunity from constitutional limitations. It must be measured by standards that satisfy the First Amendment.'' New York Times Co. v. Sullivan, 376 U.S. 267-268, 84 S.Ct. 719.

From a later part of the Supreme Court's opinion we also quote, as follows:

"A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions—and to do so on pain of libel judgments virtually unlimited in amount—leads to a comparable 'self-censorship.' Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred. Even courts accepting this defense as an adequate safeguard have recognized the difficulties of adducing legal proofs that the alleged libel was true in all of its factual particulars. See, e. g., Post Publishing Co. v. Hallam, 59 F. 530, 540 (C.A. 6th Circuit 1893). See also Noel, Defamation of Public Officers and Candidates, 49 Col.L.Rev. 875, 892 (1949). Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so. They tend to make only statements which 'steer far wider of the unlawful zone.' Speiser v. Randall, supra, 357 U.S., [513] at 526 [78 S.Ct. at 1332, 2 L.Ed.(2d) 1460]. The rule thus dampens the vigor and limits the variety of public debate. It is inconsistent with the First and Fourteenth Amendments.

The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not. An oft-cited statement of a like rule, which has been adopted by a number of state courts, is found in the Kansas case of Coleman

v. MacLennan, 78 Kan. 711, 98 P. 281 [20 L.R.A.,N.S., 361] (1908).

\* \* \* \* \* \*

Such a privilege for criticism of official conduct is appropriately analogous to the protection accorded a public official when *he* is sued for libel by a private citizen. In Barr v. Matteo, 360 U.S. 564, 575 [79 S.Ct. 1335, 1341, 3 L.Ed.(2d) 1434], this Court held the utterance of a federal official to be absolutely privileged if made 'within the outer perimeter' of his duties. The States accord the same immunity to statements of their highest officers, although they differentiate their lessor officials and qualify the privilege they enjoy. But all hold that all officials are protected unless actual malice can be proved. The reason for the official privilege is said to be that the threat of damage suits would otherwise 'inhibit the fearless, vigorous, and effective administration of policies of government' and 'dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties.' Barr v. Matteo, supra, 360 U.S., at 571 [79 S.Ct., at 1339, 3 L.Ed.(2d) 1434]. Analogous considerations support the privilege of a citizen-critic of government. It is as much his duty to criticize as it is the official's duty to administer. See Whitney v. People of State of California, 274 U.S. 357, 375 [47 S.Ct. 641, 648, 71 L.Ed. 1095]. (Concurring opinion by Mr. Justice Brandeis, quoted supra, page 270, 84 S.Ct. page 720). As Madison said, see supra page 275, 84 S.Ct. page 723, 'The censorial power is in the people over the Government, and not in the Government over the people.' It would give public servants an unjustified preference over the public to serve as critics, if official conduct

did not have a fair equivalent of the immunity granted to the officials themselves.

We conclude that such privilege is required by the First and Fourteenth Amendments.

We hold today that the Constitution delimits a State's power to award damages for libel in actions brought by public officials against critics of their official conduct. Since this is such an action, the rule requiring proof of actual malice is applicable. While Alabama law apparently requires proof of actual malice for an award of punitive damages, where general damages are concerned malice is 'presumed.' Such a presumption is inconsistent with the federal rule. 'The power to create presumptions is not a means of escape from constitutional restrictions,' Bailey v. State of Alabama, 219 U.S. 219, 239, [31 S.Ct. 145, 151, 55 L.Ed. 191]; 'the showing of malice required for the forfeiture of the privilege is not presumed but is a matter for proof by the plaintiff * * *.' Lawrence v. Fox, 357 Mich. 134, 146, 97 N.W.(2d) 719, 725 (1959). Since the trial judge did not instruct the jury to differentiate between general and punitive damages, it may be that the verdict was wholly an award of one or the other. But is is impossible to know, in view of the general verdict returned. Because of this uncertainty, the judgment must be reversed and the case remanded. Stromberg v. People of State of California, 283 U.S. 359, 367-368 [51 S.Ct. 532, 535, 75 L.Ed. 1117]; Williams v. State of North Carolina, 317 U.S. 287, 291-292 [63 S.Ct. 207, 209-210, 87 L.Ed. 279]; See Yates v. United States, 354 U.S. 298, 311-312 [77 S.Ct. 1064, 1073, 1 L.Ed.(2d) 1356]; Cramer v. United States, 325 U.S. 1, 36 note 45 [65 S.Ct. 918, 935, 89 L.Ed. 1441].''

398

New York Times Co. v. Sullivan, 376 U.S. 278-284, 84 S.Ct. 725-728.

In the later case of Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.(2d) 125, the U. S. Supreme Court reaffirmed its decision in the case of New York Times Co. v. Sullivan, and applied the same rule in a case of criminal libel as had been applied in New York Times Co. v. Sullivan to a civil suit for libel. The opinion in that case was also written by Mr. Justice Brennan, and from that opinion, we quote, as follows:

"We held in New York Times that a public official may be allowed the civil remedy only if he establishes that it was made with knowledge of its falsity or reckless disregard of whether it was false or true. The reasons which caused us so to hold in New York Times, 376 U.S., at 279-280, [84 S.Ct. at 724-726], apply with no less force merely because the remedy is criminal. The constitutional guarantees that freedom of expression compel application of the same standard to the criminal remedy. Truth may not be the subject of either civil or criminal sanctions where discussions of public affairs is concerned. And since '* * * erroneous statement is inevitable in free debate, and * * * it must be protected if the freedom of expression are to have the breathing space' that they 'need * * * to survive' * * *,' 376 U.S., at 271-272, [84 S.Ct. at 721], only those false statements made with the high degree of awareness of their probable falsity demanded by New York Times may be the subject of either civil or criminal sanctions. For speech concerning public affairs (p. 75 [85 S.Ct. p. 216]) is more than self expression; it is the essence of self-government. The First and Fourteenth Amendments embody 'profound national com-

mitment to the principle that debate on public issues should be uninhibited, robust and wide open, and that it may well include vehement, caustic and sometimes unpleasantly sharp attacks on government and public officials'." Garrison v. State of Louisiana, 379 U.S. 74-75, 85 S.Ct. 215-216.

Feeling bound, as we do, by the decisions of the United States Supreme Court in New York Times Co. v. Sullivan and Garrison v. State of Louisiana, we are constrained to overrule all of the plaintiff's assignments of error and affirm the judgment of the lower court in favor of the defendant. A judgment to that effect may be entered in this Court.

The costs of the cause are adjudged against the plaintiff and his sureties on the appeal bond and on the cost bond filed in the lower court.

McAmis, P. J., Avery, P. J. (W.S.), and Carney, Cooper, and Parrott, JJ., concur.