James Slack, the defendant in an action in the Jefferson Circuit Court alleging against Slack defamation, invasion of privacy, and intentional interference with a business contract, appeals from a judgment in favor of Christopher Stream, the plaintiff. We affirm.
 I. Factual Background and Procedural History
The testimony at trial reveals the following facts. In the fall of 2002, Stream accepted an appointment as assistant professor in the Department of Government at the University of Alabama at Birmingham ("UAB").
During the summer of 2003, the Young Men's Business Club of Birmingham invited Stream to speak about Amendment One, a proposed constitutional amendment *Page 518 
placed on the ballot in a 2003 special election that would have significantly restructured the sources of revenue for Alabama. Stream asked his graduate assistant, Vladimir Shilkrot, to assist him in finding newspaper articles concerning Amendment One. Stream used these newspaper articles, as well as other articles and research he had compiled, to compose his notes for the speech.
Soon after Stream presented the speech, Michael Howell-Moroney, also an assistant professor of government at UAB, approached Stream about coauthoring an article regarding Amendment One for submission to a scholarly journal. The article, Evidence ofPublic Regardingness: Doing the Right Thing in the Alabama TaxVote? was submitted to the Journal of Politics
("the JOP"). On December 17, 2003, William G. Jacoby, the editor of the JOP, e-mailed Stream, informing him that the article was being rejected for publication based on the reviews of two referees.[1] In his e-mail, Jacoby referenced issues raised by the two referees such as "the sizable literature of self-interest effects" that were not referenced in the article, the model specification, and the use of aggregate data to test hypotheses about individual behavior. Jacoby, however, encouraged Stream and Howell-Moroney to revise their article using the referee's critiques and to submit the article to a more subject-focused journal.
Attached to Jacoby's e-mail were the comments from the two referees, designated as "reviewer 1" and "reviewer 2." Although the reviewer's comments concerning the alleged plagiarism were not specifically referenced in Jacoby's e-mail, reviewer 1 stated in his comments:
 "The quality of writing is also problematic, in that I found several instances of plagiarism in the manuscript with fairly modest effort (I suspect there are many more cases in the paper as well). This is completely unacceptable for a manuscript submitted for publication. If one of my students had turned in this paper to me, he or she would have faced serious penalties in the university's honor court."
(Emphasis in original.) Reviewer 1 quoted three sources he found had been plagiarized: an Associated Press article by Phillip Rawls, an article by Thomas Spencer, and an article from the Clarke County Democrat, a local newspaper in Grove Hill.
Stream forwarded Jacoby's e-mail to Howell-Moroney on the same day he received it. After reading the comments of reviewer 1, Howell-Moroney telephoned Stream and learned that Stream had not read the reviewers' comments. Upon learning that one of the reviewers had found incidences of plagiarism in the article, Stream testified that he was "stunned," "embarrassed," and "ashamed." Stream claims that during the conversation with Howell-Moroney, while thinking aloud he stated that he wondered if the plagiarized material could have come from materials provided by Shilkrot. That evening, Stream e-mailed Howell-Moroney apologizing for his "laziness." In the e-mail, Stream wrote: "It's no excuse, but I've had several career decisions to make this semester and the stress has gotten to me. I had hoped to ease my stress by taking advantage of my grad assistant, but that's no excuse. It was still my responsibility to check what he had given me." Howell-Moroney responded to Stream's e-mail, writing: "I appreciate your apology, but don't hassle it. Let's just tighten that *Page 519 
puppy up and send it back out."[2]
By the 2003-2004 academic year, Stream had become dissatisfied at UAB and decided to look for other employment. On January 26, 2004, the University of Nevada, Las Vegas ("UNLV"), extended an offer to Stream to become assistant professor in its Department of Public Administration, and Stream accepted UNLV's offer on January 30, 2004, to begin teaching there in the summer of 2004. Howell-Moroney learned on or about February 16, 2004, of Stream's planned departure from UAB and decided at that time that he would inform Slack of reviewer 1's findings of plagiarism. According to Howell-Moroney, he decided to inform Slack of reviewer 1's findings because he believed that he could be accused of plagiarism if it was ever disclosed that the reviewer found incidences of plagiarism in the manuscript. Upon learning of reviewer 1's finding of plagiarism, Slack asked for and received a copy of the e-mail from Jacoby and a copy of the manuscript.
After reviewing the manuscript, Jacoby's e-mail to Stream, and the reviewers' comments, Slack reviewed the university handbook, but he was unable to find a policy or procedure dealing with plagiarism by a member of the faculty. According to Slack, he met with Tennant McWilliams, dean of UAB's School of Social and Behavioral Sciences, [3] before March 1, 2004, regarding the plagiarism incident, and Dean McWilliams did not disclose to him during that meeting that a policy existed concerning plagiarism by a faculty member. Dean McWilliams, however, does not recall such a meeting. Purportedly unable to find a policy regarding plagiarism by a faculty member, Slack conducted research on the Internet and found, among other items, a "Statement on Plagiarism" approved by the American Association of University Professors. The "Statement on Plagiarism" stated, in part:
 "Any discovery of suspected plagiarism should be brought at once to the attention of the affected parties and, as appropriate, to the profession at large through proper and effective channels — typically through reviews in or communications to relevant scholarly journals."
Slack contacted Jacoby and had tenured professors in the Department of Government review the manuscript. Slack also telephoned Shilkrot because Howell-Moroney had stated that Stream mentioned Shilkrot and because Shilkrot was referenced in the e-mail exchange between Howell-Moroney and Stream. In an e-mail from Shilkrot to Slack following their telephone conversation, Shilkrot said that he had summarized for Stream five articles for a political science publication that had been submitted to Stream for peer review as a time-saving measure for Stream.
On March 17, 2004, Slack called Stream into his office and asked Stream if he was "associated" with a claim of plagiarism. Stream responded that he was not. Slack then asked Stream if he had submitted a manuscript to the JOP that had been rejected because of plagiarism. Stream responded that he and Howell-Moroney had submitted an article to the JOP and that the article had been rejected but that it had not been rejected for plagiarism. *Page 520 
Stream alleges that he ended the conversation with Slack so he could discuss the matter with Howell-Moroney to "put things in context."
On March 17, 2004, in response to numerous requests from Slack, Jacoby sent Slack a memorandum explaining that, besides the issues mentioned in Jacoby's e-mail to Stream of December 17, 2003, Stream and Howell-Moroney's manuscript "probably would have been rejected anyway" because of the plagiarism found by reviewer 1.
On March 18, 2004, Slack wrote the following letter to Stream:
 "This letter serves as a REPRIMAND for UNETHICAL SCHOLARLY BEHAVIOR.
 "(1) During Fall Semester 2003, you and a co-author submitted a manuscript, entitled `Evidence of Public Regardingness: Doing the Right Thing in the Alabama Tax Vote,' to the Journal of Politics (JOP
manuscript 111803A).
 "(2) During Fall Semester 2003, you received a copy of the reviewers' comments on the paper.
 "(3) Reviewer number 1 . . . states:
 "`The quality of writing is also problematic, in that I found several instances of plagiarism in the manuscript with fairly modest effort (I suspect there are many more cases in the paper as well). This is completely unacceptable for a manuscript submitted for publication. If one of my students had turned in this paper to me, he or she would have faced serious penalties in the university's honor court.'
 "(4) Reviewer number 1 provides three examples of plagiarism. . . ."
 (5) According to the co-author, you admitted that the plagiarization occurred in the manuscript sections for which you had writing responsibility.
 "(6) The co-authored [sic] provides a 17 December 2003 e-mail . . . from you to verify that you took responsibility for the plagiarized sections of the manuscript.
 "(7) In the 17 December 2003 e-mail, you place blame for the plagiarism on your MPA graduate assistant.
 "(8) However, in a 25 February e-mail . . ., the MPA graduate assistant asserts the following:"
 • That you instructed the graduate assistant to collect summaries for the manuscript.
 "• That you did not make him aware, nor get his permission for quoting his own intellectual property verbatim in your manuscript.
 "• (As a relevant aside, the graduate assistant also asserts that you instructed him to read and summarize five (5) manuscripts sent to you by a reputable scholarly journal(s) seeking your expert opinion and not the opinion of someone with a bachelor's degree, in this case, the MPA graduate assistant. According to the graduate assistant, this was done as a `time saving measure' for yourself.)[4] *Page 521 
 "(9) Furthermore, the passages in question, those to which reviewer number 1 calls attention, are without citation. Hence, even if the MPA graduate assistant provided you with satisfactory paraphrases, there is still no citation of the source of those paraphrases.
 "(10) On 17 March, I talked with you about the issue. You denied knowing anything about the word `plagiarism' being included in a review of a manuscript submitted to JOP. You initially offered to let me see the reviews but, once I accepted the offer, you said that you had not received a hard copy from JOP and you had erased the electronic version.
 "(11) On 17 March you called the co-author to discuss our conversation. The co-author has sent me an e-mail . . . outlining that conversation in which he heard you admit that you intentionally lied to me.
 "(12) On 17 March I received an e-mail from the editor of JOP . . ., in which he verifies that plagiarism did occur and that this is `reprehensible and unethical behavior.'
 "It matters not whether you plagiarized as a result of poorly paraphrased passages submitted by a third party (in this case, an MPA graduate student), or whether you plagiarized the actual words of this same third party who never gave you permission to use those words as your own. You did not cite the original source (even if the student would have supplied an acceptable paraphrase), and you did not even officially acknowledge in the manuscript that you were using the words crafted by that student.
 "It matters not because plagiarism of any flavor constitutes intellectual theft, instills doubt in our discipline's ability to self-govern scholarship, and ultimately constitutes the rape of the academy.
 "What journal editors decide to do with you — for both plagiarism and passing off to persons with bachelor degrees manuscripts which were written in earnest, sent to reputable scholarly outlets in earnest, and then entrusted to you for deliberation — is beyond my realm. But what is equally telling is this: I have taken the time, as well as your co-author, to apologize to the Journal of Politics. As of this date, you have not.
 "What your new employer does with you is also none of my business. Whether the University of Nevada at Las Vegas considers your actions to constitute an academic misdemeanor or a capital offense will ultimately reflect on its faculty and the value that its faculty and administration places on scholarly integrity and intellectual honesty.
 "But as far as this department is concerned, had you not resigned your tenure-track faculty position and chose to remain at UAB, a strong recommendation to central administration would have been forthcoming for, the issuance of a termination notice.
 "Your behavior is deeply troubling, not just because of its potential harm to the reputation of the Department of Government at UAB, but also because of the actual damage it inflicts upon the academy and the fundamental processes in which the academy invests to guarantee honesty and quality in the discovery *Page 522 
and dissemination of new knowledge in our discipline.
 "It is for the reasons stated above that I render this reprimand."
(Capitalization and emphasis in original.) Slack placed a copy of the letter in Stream's office mailbox, mailed a copy of the letter to Stream via first-class mail, and had his secretary escort him to Stream's office, where Slack watched as she taped a copy of the letter to Stream's chair. Attached to the letter were various documents and correspondence referenced in the letter. Stream was not in his office on March 18, 2004, to receive the letter.
Dean McWilliams recalls meeting Slack in the hallway at UAB on the morning of March 18, 2004. Slack mentioned to Dean McWilliams that he had serious concerns about a case of plagiarism by Stream. Dean McWilliams suggested the two meet that afternoon to discuss the matter. Dean McWilliams then went into a meeting, and when he emerged from the meeting he found the letter of reprimand and its attachments sitting on his secretary's desk. Dean McWilliams became concerned because the attachments indicated that the letter of reprimand had been sent to various universities and journals. Dean McWilliams telephoned the office of general counsel for UAB and was told not to discuss the Stream situation with Slack. The following week during an alumni dinner in Georgetown, District of Columbia, Dean McWilliams had a discussion with Slack regarding Stream but avoided any conversation about UAB's written policy concerning plagiarism based on the advice of general counsel. He avoided such conversation based on his understanding that Slack had acted outside the scope of his authority by issuing the letter of reprimand and disseminating it to individuals outside UAB.
On the morning of March 18, 2004, Slack telephoned Lee Bernick, chairman of the Public Administration Department at UNLV, at his home between 6:00 a.m. and 6:30 a.m. Slack introduced himself to Bernick and asked Bernick if he knew he was hiring a plagiarist. Bernick stated that he needed more information, and Slack informed Bernick that he would be sending information via facsimile. When Bernick arrived at his office, he found a copy of Jacoby's memorandum of March 17, 2004, as well as reviewer 1's comments. Later in the morning Bernick received an e-mail from Slack requesting confirmation that he had received the facsimile. Bernick replied via e-mail, "I did receive the information. Thank you for the material." Slack replied to that e-mail on the morning of March 19, stating, "FYI. Here is the letter that [Stream] is receiving today in the mail." Attached was the letter of reprimand. Slack then forwarded to Bernick two e-mails Stream had sent Slack requesting that Stream and Slack meet. Bernick testified that he felt that by referencing UNLV in the letter Slack "was trying to intimidate the university, UNLV, into not hiring Dr. Stream."
Unbeknownst to Stream, Slack also sent copies of the letter of reprimand to the chair of the Department of Government at Florida State University (the institution that had awarded Stream his Ph.D. degree), as well as to the editors of at least eight scholarly journals that had published articles authored by faculty of UAB's Department of Government. In his cover letter to the chairman of the Department of Government at Florida State, Slack wrote: "[Y]ou should know that he is a graduate of your doctoral program. While I realize that one bad apple does not spoil the barrel, I'm sure you understand that the product of one's program influences the opinion of others about that program." In his cover letter to the Journal ofPublic *Page 523 Affairs Education, Slack wrote: "Whether or not you want this person to affiliate in any way with your journal is your choice." In his cover letter to the editor of theAmerican Review of Public Administration, Slack wrote: "Whether you want this person to affiliate with theAmerican Review of Public Administration is your choice, but I submit this letter of reprimand to you." In his cover letter to the editor of the Public AdministrationReview, Slack wrote: "Whether or not you want this person to affiliate in any way with PAR is naturally your choice, but you need to know this." Slack sent similar cover letters to the Urban Affairs Review and theJournal of Urban Affairs. In all the cover letters, Slack stated: "In fact finding, I discovered that he also let an unqualified third party review and summarize manuscripts for him that were specifically sent to him as an external referee by a reputable journal."
Upon receiving the letter of reprimand, Bernick informed Martha Watson, dean of UNLV's College of Urban Affairs, of the allegations against Stream. Watson and Bernick telephoned Stream and asked him to come to Las Vegas so they could discuss the allegations. Stream met with Watson and Bernick on March 30, 2004. On March 31, 2004, Watson wrote a memorandum to UNLV's president and provost explaining the investigative process and her findings. Watson concluded that the incidences of plagiarism in the manuscript constituted sloppy scholarship and that she found no evidence that Stream intended to plagiarize. Thus, she proposed that UNLV not rescind its job offer to Stream. In doing so, Watson wrote:
 "Further, I am concerned about the process whereby we became aware of this problem, which resembles a systematic effort to ruin a career. Certainly, a letter of reprimand was warranted; providing us with unsolicited copies of this confidential personnel document and writing to the institutions which granted the Ph.D. seems excessive. Finally and most importantly, we have been given confidential personnel documents (e.g., the letter of reprimand) which we did not request. Our use of that material to terminate our contract with Stream raises ethical and perhaps has legal implications."
UNLV's president eventually approved Watson's recommendation, and Stream was allowed to join the UNLV faculty for the fall semester 2004. However, Bernick had initially offered to allow Stream to teach two summer courses at UNLV in 2004 for which he would have been paid between $10,000 and $12,000. Because of the ongoing investigation, Stream was not permitted to teach these classes.
The faculty of the Department of Government held a meeting on April 2, 2004, regarding plagiarism. According to Angela Lewis, a member of the faculty in the Department of Government, during the April 2 meeting Slack told the faculty that Stream had plagiarized in a manuscript submitted to the JOP.
Lewis also alleged that Slack had told her that Stream had misused a graduate assistant. Lewis further stated that after learning of the charges against Stream, she was afraid to be associated with Stream during the remainder of his tenure at UAB. In fact, she considered Stream to be "an academic leper." According to Lewis:
 "Well, if a junior faculty member commits plagiarism and you're associated with that person, it can harm your career. If you're associated with them, either publishing with them or doing any kind of work with them, I mean, it can harm my reputation in my field and my career and my reputation at UAB." *Page 524 
Gary Mans, director of public relations at UAB and a former graduate student in the Department of Government, recalled receiving a telephone call from Slack in which Slack stated that he had information that Stream had possibly committed plagiarism and that he was going to see to it that Stream never worked in academia again. Slack, however, denies ever having such a conversation with Mans.
 Rachel Harris, who was a student in UAB's Department of Government during the spring semester 2004, had a conversation with Slack regarding Stream's departure from UAB. According to Harris, she understood from her conversation with Slack that Stream was being forced out of UAB because of plagiarism. Harris also stated that "one of the biggest things [she] heard" among students in UAB's Department of Government during the spring semester 2004 was about Stream and plagiarism.
 After learning that Slack had disseminated the letter of reprimand to UNLV, Florida State, and various journals, Stream wrote a letter to those individuals who had received a copy of the reprimand letter, explaining that the allegations contained in the letter were untrue, that Slack had not followed due process in investigating the allegations, and that UAB was investigating whether Slack had violated UAB policy in sending the letter of reprimand to them.
 Although Slack stated that he was unable to find a policy applicable to plagiarism by a faculty member in the faculty handbook, the handbook contained a "Policy Concerning the Maintenance of High Ethical Standards in Research and Other Scholarly Activities" ("policy 22"). Policy 22 contains the following pertinent provisions:
 "Any UAB employee (including, but not limited to, regular and adjunct faculty, fellows, technicians, and student employees) or any UAB student who has reason to suspect any other employee or student of misconduct with regard to the conducting or reporting of research has the responsibility of following up these suspicions in accordance with the procedures outlined below. For purposes of this policy, `misconduct' means fabrication, falsification, plagiarism, or other practices which seriously deviate from those that are commonly accepted within the scientific community for proposing, conducting, or reporting research. It does not include honest error or honest differences in interpretations or judgments of data.
 ". . . .
 "It is the responsibility of student employees, trainees, fellows, faculty members, staff members, or other employees who become aware of misconduct in research and other scholarly activities to report such misconduct to one of the following: (a) their department/unit head, (b) the dean of the school in which their department/unit is located, or (c) the UAB Scientific Integrity Officer. In the case of graduate students or of trainees at any level, such evidence also may be reported to the Dean of the Graduate School.
 "The individual receiving such evidence of misconduct must immediately report such evidence and the allegation of misconduct to the UAB Scientific Integrity Officer, the department/unit head and the dean of the unit in which the alleged misconduct occurred, and the Provost. If the UAB Scientific Integrity Officer determines that the allegation warrants initiation of the inquiry process, the inquiry shall be initiated immediately, and the Office of Counsel shall be informed. *Page 525 
 "Allegations of this nature are very serious matters, and all parties involved should take measures to assure that the positions and reputations of all individuals named in such allegations and all individuals who in good faith report apparent misconduct are protected. Details of the charge, the name of the accused, the identity of the individual bringing suspected fraud, and all other information about the case shall be kept confidential as far as possible, compatible with investigating the case. Revealing confidential information to those not involved in the investigation shall itself be considered misconduct."
Slack contends that he was not aware of policy 22 until UAB's provost referenced it in communications to Slack on April 23, 2004.
On April 27, 2004, then acting UAB Provost Eli Capilouto[5]
sent a memorandum to the provost of UNLV, stating:
 "I understand you were forwarded a copy of a letter of `reprimand' dated March 18, 2004 from Dr. James Slack to Dr. Christopher Stream. We are reviewing the facts of this matter. The University of Alabama at Birmingham has not made a finding of wrongdoing. Any suggestion to the contrary by Dr. Slack was not the result of an inquiry by the University into the matter and was, at best, premature."
UAB initiated an investigation in accordance with policy 22 as to both the claim of plagiarism against Stream and Slack's actions in writing and disseminating the letter of reprimand. The committee assembled to conduct the investigation questioned all participants in the matter. Immediately before Slack's meeting with the committee, Dean McWilliams required Slack to tender his resignation as chairman of the Department of Government.
The investigative committee concluded that although the manuscript for the article contained verbatim quotes from published newspaper articles without attribution, there were mitigating circumstances surrounding the writing of the manuscript. The committee also concluded that Slack, as chairman of the department, should have been aware of policy 22 or should have at least sought guidance from Dean McWilliams and the Scientific Integrity Officer before writing a letter of reprimand without investigating the allegations and then circulating the letter of reprimand to uninterested parties.
Provost Capilouto stated that he found Slack's dissemination of the letter of reprimand beyond UAB to be unacceptable. He also called Slack's actions "callously precipitous." Provost Capilouto also ordered Slack to stop distributing information about Stream. According to Provost Capilouto, Slack committed himself to working with Stream in making the appropriate retractions. However, Slack never made the retractions.
On June 28, 2004, Stream sued Slack and UAB in the Jefferson Circuit Court. Stream alleged that Slack was guilty of defamation, invasion of privacy, and intentional interference with a business contract.[6] On August 3, 2005, Slack filed a counterclaim, alleging that Stream had defamed him by disseminating to journal editors information that Slack was being investigated *Page 526 
by UAB for his actions relating to the letter of reprimand; Slack also filed a cross-claim against UAB, alleging that UAB had denied him due process by forcing him to resign as chairman of the Department of Government and that UAB had retaliated against him by forcing his resignation as chairman of the department in response to the exercise of his First Amendment right to free speech. The trial court eventually dismissed all claims and cross-claims against UAB based on the doctrine of sovereign immunity. Slack moved for a summary judgment in his favor based on the doctrine of State-agent immunity, which the trial court denied.
On June 14, 2006, the jury returned a verdict in favor of Stream on Stream's claims of defamation, invasion of privacy, and intentional interference with a business contract against Slack, awarding Stream $212,000 in compensatory damages and $450,000 in punitive damages. The jury also returned a verdict in favor of Stream on Slack's counterclaim. A judgment was entered by the trial court on the jury's verdict.
On July 14, 2006, Slack filed a motion for a new trial as well as a renewed motion for a judgment as a matter of law or, in the alternative, for a remittitur; the trial court denied those motions on August 14, 2006. Slack appeals the judgment only as to Stream's claims against him.
 II. Standard of Review
"This Court conducts a de novo review of rulings on a motion for a summary judgment and on a motion for a judgment as a matter of law. Bailey v. Faulkner, 940 So.2d 247, 249
(Ala. 2006). In Butler v. Town of Argo, 871 So.2d 1,11-12 (Ala. 2003), we recognized:
 "`"`[T]his Court uses the same standard the trial court used initially in granting or denying a [judgment as a matter of law]. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala. 1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350
(Ala. 1992). For actions filed after June 11, 1987, the nonmovant must present "substantial evidence" in order to withstand a motion for a [judgment as a matter of law]. See § 12-21-12, Ala. Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a [judgment as a matter of law], this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Motion Industries, Inc. v. Pate, 678 So.2d 724 (Ala. 1996). Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas Co., 599 So.2d 1126 (Ala. 1992).'
 "`I.C.U. Investigations, Inc. v. Jones, 780 So.2d 685, 688 (Ala. 2000).'
"With regard to review of a trial court's ruling on a motion for a new trial, this Court has stated:
 "`"It is well established that a ruling on a motion for a new trial rests within the sound discretion of the *Page 527 
trial judge. The exercise of that discretion carries with it a presumption of correctness, which will not be disturbed by this Court unless some legal right is abused and the record plainly and palpably shows the trial judge to be in error."'
 "Curtis v. Faulkner Univ., 575 So.2d 1064, 1066 (Ala. 1991) (quoting Kane v. Edward J. Woerner Sons, Inc., 543 So.2d 693, 694
(Ala. 1989))."
Cottrell v. National Collegiate Athletic Ass'n,975 So.2d 306, 332 (Ala. 2007).
 III. Analysis
On appeal, Slack makes three arguments: (1) that he is entitled to State-agent immunity, (2) that the award of compensatory damages is not supported by the testimony and evidence, and (3) that the award of punitive damages is not supported by the testimony and evidence.
 A. State-Agent Immunity
Slack asks this Court to extend the doctrine of State-agent immunity to include State agents who essentially fail to discharge their duties as required by rules or regulations because they are ignorant of those rules and regulations. We decline to do so.
 "`Since [Ex parte] Cranman [, 792 So.2d 392
(Ala. 2000)], we analyze immunity issues in terms of "State-agent" immunity rather than "under the dichotomy of ministerial versus discretionary functions."' Howard v. City of Atmore, 887 So.2d 201, 203 (Ala. 2003) (quoting Ex parte Hudson, 886 So.2d 1115, 1117 (Ala. 2003)). In Ex parte Cranman, 792 So.2d 392 (Ala. 2000), a plurality of this Court restated the rule governing State-agent immunity:
 "`A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
 "`(1) formulating plans, policies, or designs; or
 "`(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
 "`(a) making administrative adjudications;
 "`(b) allocating resources;
 "`(c) negotiating contracts;
 "`(d) hiring, firing, transferring, assigning, or supervising personnel; or
 "`(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
 "`(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
 "`(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
 "`Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
 "`(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating *Page 528 
the activities of a governmental agency require otherwise; or
 "`(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.'
"792 So.2d at 405 (some emphasis added [in Feagins]). In Ex parte Butts, 775 So.2d 173 (Ala. 2000), a majority of this Court adopted the Cranman restatement of the rule governing State-agent immunity.
 "`We have established a "burden-shifting" process when a party raises the defense of State-agent immunity. Ex parte Wood, 852 So.2d 705 (Ala. 2002). In order to claim State-agent immunity, the [defendants] bear the burden of demonstrating that [the plaintiffs] claims arise from a function that would entitle them to immunity. Wood, 852 So.2d at 709; Ryan v. Hayes, 831 So.2d 21 (Ala. 2002). If the [defendants] make such a showing, the burden then shifts to [the plaintiff], who, in order to deny the [defendants] immunity from suit, must establish that the [defendants] acted willfully, maliciously, fraudulently, in bad faith, or beyond their authority. Wood, 852 So.2d at 709; Ex parte Davis, 721 So.2d 685, 689 (Ala. 1998). A State agent acts beyond authority and is therefore not immune when he or she "fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist." Ex parte Butts, 775 So.2d 173, 178 (Ala. 2000).'
 "Giambrone v. Douglas, 874 So.2d 1046, 1052
(Ala. 2003)."
Feagins v. Waddy, 978 So.2d 712, 715-16 (Ala. 2007).
Slack contends that his actions relating to reprimanding Stream met at least four of the criteria set forth in Ex parteCranman, 792 So.2d 392 (Ala. 2000). Specifically, he argues that, in reprimanding Stream, he (1) was formulating a plan or policy for handling the charges of plagiarism; (2) was exercising his judgment in the administration of the Department of Government of UAB, a state-supported institution of higher learning; (3) was engaging in conduct necessary to supervise personnel in the department of which he was the chairman; and (4) was attempting to discharge his duties as chairman of the Department of Government.
Assuming, without holding, that Slack has met his burden of "demonstrating that [his] claims arise from a function that would entitle them to immunity," Giambrone v. Douglas,874 So.2d 1046, 1052 (Ala. 2003), thus shifting the burden to Stream to prove that Slack is not immune from suit, sufficient evidence exists for the trial court's holding that Slack is not entitled to State-agent immunity.
This Court has previously held that "[a] State agent acts beyond authority and is therefore not immune when he or she `fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.'"Giambrone, 874 So.2d at 1052 (quoting Ex parteButts, 775 So.2d 173, 178 (Ala. 2000)). It is undisputed that Slack failed to abide by the detailed guidelines for investigating a claim of plagiarism by a member of the faculty provided for in policy 22, which also included a checklist for the person investigating the plagiarism. Slack, however, argues that this Court should create an exception to this rule of law because, he says, he searched for a policy in the university handbook and was unable to find a policy applicable to Stream's situation. In support of his argument, Slack cites this Court's recent decisions in Ex parte Reynolds, 946 So.2d 450
(Ala. 2006), and Ex parte Randall, 971 So.2d 652
(Ala. 2007), in *Page 529 
which, he contends, this Court has held "that a defendant's failure to follow a set of rules does not automatically remove the cloak of state-agent immunity from a defendant state-agent." (Slack's brief, p. 39.) Both Reynolds
and Randall, however, are distinguishable.
In Reynolds, the plaintiff, who was injured in an automobile accident, alleged that the accident resulted when the tires of his vehicle left the roadway and he was unable to steer the vehicle back onto the roadway. The plaintiff alleged that his inability to steer the vehicle back on the roadway was caused by the front right tire of his automobile entering a "channel" in the paved surface. The plaintiff sued the district engineer of the Alabama Department of Transportation ("ALDOT") as well as ALDOT's district maintenance superintendent, alleging that the two had negligently, wantonly, willfully, maliciously, fraudulently, and in bad faith failed to inspect, maintain, and repair the area of the roadway where the accident occurred. The evidence indicated that both the district engineer and maintenance superintendent inspected highways in the district, determined whether maintenance and repair were necessary, and supervised the roadwork. Both men would prioritize and rank projects based on the degree of the danger a condition created, the type of work needed, the availability of labor resources, and the particular road. Both men used ALDOT's "Maintenance Manual" and "Field Operations Manual" in performing their duties. The maintenance supervisor, however, argued that the manuals often did not provide explicit guidelines for particular situations and that the exercise of judgment was often required. The plaintiff, however, argued that the district engineer and maintenance supervisor were negligent in inspecting the road in question because the former acting district engineer testified via affidavit that he had observed numerous places on the road where the pavement and shoulder had been damaged by large trucks getting too close to the shoulder of the road. He also testified via affidavit that the road contained areas where the shoulder was higher than the roadway as well as areas where the shoulder was lower than the roadway.
In issuing the writ of mandamus, this Court held that although the ALDOT manuals set forth criteria by which decisions were made and set out duties, the manuals gave the district engineer and district maintenance supervisor a significant degree of discretion in inspecting the highways, formulating plans and policies, and exercising judgment in allocating resources for inspections. Thus, by exercising judgment in actually undertaking to accomplish the necessary maintenance and repairs, the district engineer and district maintenance supervisor were entitled to State-agent immunity. UnlikeReynolds, where the question presented was whether ALDOT's rules and regulations allowed its employees to exercise their judgment and discretion, this Court is now faced with a situation where Slack completely disregarded UAB's written policy.
In Ex parte Randall, the parents of an infant who died at a day-care facility filed a wrongful-death and fraud action against a social worker with the Department of Human Resources ("DHR"). The parents alleged that the social worker failed to detect, when completing licensing-evaluation forms during an in-home inspection of the day-care facility, that the day-care provider was administering medication to children without proper documentation from the parents and failed to detect that the children at the day-care facility were improperly supervised. The social worker moved for a summary judgment, asserting State-agent immunity as a defense. The *Page 530 
trial court denied the motion, and the social worker petitioned this Court for a writ of mandamus. In issuing the writ, this Court held that the social worker was entitled to State-agent immunity as to the parents' allegations regarding administering medication to children because the social worker's behavior in failing to detect that the day-care provider was administering medication to children without the proper written documentation from their parents was only negligent and/or wanton.
Slack's argument devolves to an assertion that he should be cloaked in State-agent immunity because the dean of his school and the provost of the university did not instruct him as to the existence of policy 22, that he made an effort to find an applicable policy in the UAB handbook, and that only when he was unable to find a policy he thought applied did he promulgate his own procedure. This argument neglects the fact that Slack received a copy of the UAB handbook in 1999 when he accepted the position of chairman of the Department of Government, approximately five years before the incidents underlying this action occurred, and that as chairman of the department he had an obligation to be familiar with UAB's policies and procedures as determined by the UAB committee that investigated whether Slack violated policy 22.
The foreseeable consequences of a rule that would cloak a State agent with State-agent immunity when he or she acts without knowledge of a rule or regulation are undesirable. Such a rule would encourage nefarious individuals with knowledge of a rule or regulation that they do not wish to follow to violate the rule and regulation, only to later claim ignorance of the rule or regulation. Our courts should not be burdened with the duty of determining whether an individual was truly ignorant of a rule or regulation. Thus, we decline to extend State-agent immunity to individuals who are ignorant of the rules and regulations of the State agency with which they are employed.
Moreover, Slack loses the protection of State-agent immunity for other reasons. First, in forwarding Stream's letter of reprimand to various institutions, Slack acted beyond his authority as chairman of UAB's Department of Government. Provost Capilouto stated in a letter to Slack that disseminating the letter of reprimand beyond UAB was not acceptable. Likewise, Dean McWilliams testified that Slack was not acting within the scope of his authority when he sent the letter of reprimand to other academic institutions.
Further, although Slack testified at trial that he did not harbor any ill will toward Stream, there is ample evidence indicating that Slack indeed acted willfully and maliciously. Mans testified that he received an unsolicited telephone call from Slack in which Slack stated that he was going to see to it that Stream never worked in academia again.[7] Slack's actions regarding UNLV were willful and malicious. In the letter of reprimand, Slack wrote:
 "What your new employer does with you is also none of my business. Whether the University of Nevada at Las Vegas considers your actions to constitute an academic misdemeanor or a capital offense will ultimately reflect on its faculty and the value that its faculty and administration places on scholarly integrity and intellectual honesty."
After composing the letter, Slack made numerous telephone calls to Bernick, sent Bernick numerous e-mails, sent Bernick the March 17 memorandum from Jacoby, *Page 531 
and sent Bernick the letter of reprimand, even though Bernick had not asked to see the letter. In fact, Slack telephoned Bernick at his home between 6:00 a.m. and 6:30 a.m. and got Bernick out of the shower to tell him that Stream had committed plagiarism. Bernick testified that he felt that Slack was trying to intimidate UNLV into not hiring Stream. Provost Capilouto referred to Slack's action as "callously precipitous." Likewise, Dean McWilliams stated that Slack pursued the situation with "intensity and . . . vigor."
Furthermore, the evidence indicates that Slack had a motive to make it appear that Stream was being forced to leave UAB because of the plagiarism charges. During Slack's tenure as chairman of the Department of Government at UAB, there had been a high turnover rate among junior faculty members. The provost's office was becoming concerned about the high turnover in Slack's department. Thus, the plagiarism charges provided Slack with a reason for Stream's departure should the provost's office inquire.
Because Slack acted willfully and maliciously in disseminating the letter of reprimand concerning Stream, as well as beyond the scope of his authority, he is not entitled to State-agent immunity. Therefore, the trial court properly denied Slack's motion for a summary judgment and motion for a judgment as a matter of law premised upon State-agent immunity.
 B. Appropriateness of Compensatory-Damages Award
Slack argues that, even if this Court upholds the judgment against him, the award of $212,000 in compensatory damages is inappropriate because, he alleges, it is wholly unsupported by the evidence. During trial, Stream sought both actual compensatory damages as well as damages for mental anguish. Slack argues that Stream was able to prove, at most, $12,000 in lost income from his inability to teach at UNLV during the summer of 2004. Slack also argues that Stream admitted that he was embarrassed about the charges of plagiarism before the letter of reprimand was written. He further argues that, although Stream claims his reputation in academia has been tarnished, Stream has successfully published in journals since the letter of reprimand was made public.
It is undisputed that Slack lost the opportunity to receive $12,000 in income from teaching summer courses at UNLV because of UNLV's investigation, which was initiated by the letter of reprimand Slack had disseminated. Thus, this Court must determine if an award of $200,000 in damages for mental anguish is excessive.
"Mental anguish includes anxiety, embarrassment, anger, fear, frustration, disappointment, worry, annoyance, and inconvenience." Horton Homes, Inc. v. Brooks,832 So.2d 44, 53 (Ala. 2001). Regarding an award of damages for mental anguish, this Court has held:
 "It is well settled that a plaintiff may recover compensatory damages for mental anguish, even when mental anguish is the only injury visited upon the plaintiff. Kmart v. Kyles, 723 So.2d 572, 578
(Ala. 1998); Alabama Power Co. v. Harmon, 483 So.2d 386, 389 (Ala. 1986). Once the plaintiff has presented some evidence of mental anguish, the question whether he should recover for such mental anguish, and, if so, how much, is a question reserved for the jury. National Ins. Assoc. v. Sockwell, 829 So.2d 111, 133 (Ala. 2002); Kmart, 723 So.2d at 578. . . . A jury's verdict is presumed correct, and that presumption is strengthened upon the trial court's denial of a motion for new trial. [Alabama Power Co. v.] Murray, 751 So.2d [494,] 500-01 [(Ala. 1999)]. On the other hand, that presumption *Page 532 
is weakened and we strictly scrutinize such a verdict when a plaintiff who claims damages solely for mental anguish fails to offer his own testimony of the mental anguish he has suffered. Sockwell, 829 So.2d at 133-34; Kmart, 723 So.2d at 578.
 "Despite our great deference to the jury's award of compensatory damages for mental anguish, we have not hesitated to remit such damages where the plaintiff has produced little or no evidence indicating that he has suffered such mental anguish. Orkin Exterminating Co. v. Jeter, 832 So.2d 25, 36-37
(Ala. 2001). The inquiry is not whether traumatic events have occurred, but whether the plaintiff has actually suffered as a result of those events. 832 So.2d at 37. When a plaintiffs testimony amounts to little more than the obvious notion that dealing with the traumatic event was `hard' or `humiliating,' we have consistently remitted damages. Delchamps, Inc. v. Bryant, 738 So.2d 824, 837 (Ala. 1999). Additionally, when a plaintiff testifies merely that he suffered `a lot' of mental anguish, we have similarly remitted damages. Oliver v. Towns, 770 So.2d 1059, 1061 (Ala. 2000); Foster v. Life Ins. Co. of Georgia, 656 So.2d 333, 336-37
(Ala. 1994)."
George H. Lanier Mem'l Hosp. v. Andrews,901 So.2d 714, 725-26 (Ala. 2004).
The case before us, however, is replete with evidence of Stream's mental anguish. Upon learning that Bernick had received a copy of the letter of reprimand, a letter of which Stream was unaware when it was sent to Bernick, Stream stated he became worried about his job at UNLV as well as his professional career. Stream also received telephone calls from junior faculty members at Florida State University, where he had earned his Ph.D., indicating that they had learned of the plagiarism charges. Stream stated he was embarrassed and ashamed that his friends and colleagues would associate him with "rape," "intellectual theft," and a "capital offense" as Slack alluded to in his letter. He felt like an outcast because his colleagues at UAB would not speak to him after learning of Slack's accusations against him. Stream felt further isolated from the faculty of the Department of Government because Slack denied him access to the department's photocopier and the facsimile machine. As of the date of trial, Stream did not know to whom the letter of reprimand had been disseminated. Stream testified that two years after the incident he still obsesses over it, continually relives the situation in his mind, and thinks about it every day. Furthermore, Stream's wife, Marnie Rice Stream, had resigned from her position at UAB, and the Streams had placed their house in Birmingham on the market in February 2004 when he learned that he had been offered the job at UNLV. The uncertainty surrounding his position at UNLV following Slack's sending the letter of reprimand to UNLV caused Stream to worry about Marnie's resignation from UAB as well as the sale of their house. Marnie testified that the events surrounding the letter of reprimand strained the Stream's marriage and caused difficulty in communications between her and Stream. The stress on their marriage also caused arguments. Marnie also testified that she saw Stream cry over the events surrounding the letter of reprimand. According to Marnie, Stream became very depressed and could not sleep.
The evidence showed other bases for awarding mental-anguish damages in light of the significance of the status of professional reputation in Stream's academic field. As Dr. Mary Guy of Florida State University testified at trial, the damage to an academician's reputation caused by an *Page 533 
accusation of plagiarism is "extreme and it takes years and years and years to overcome. . . ."
Slack argues that the truthfulness or partial truthfulness of the allegations contained in the letter of reprimand mitigates Stream's compensatory damages. In support of his argument, Slack cites Johnson Publishing Co. v. Davis,271 Ala. 474, 124 So.2d 441 (1960). In Johnson Publishing, Davis sued the publishers of Jet magazine, alleging libel for a story published in Jet that stated that Davis had attacked Rev. Ralph David Abernathy with a hatchet and pistol. The evidence showed, however, that Davis had a hatchet and a pistol on his person when he met with Abernathy about Abernathy's relationship with Davis's wife and that during the meeting Davis advanced toward Abernathy, displaying the hatchet, when Abernathy stood up. In reducing the punitive-damages award, this Court held:
 "Truth of some of the statements attributed to the defendant may be shown in mitigation of damages. Jacobs v. Herlands, 257 App. Div. 1050, 13 N.Y.S.2d 707 [(1939)]; Fleckenstein v. Friedman, 266 N.Y. 19, 193 N.E. 537 [(1934)], and `Well settled is the basic rule that the amount of plaintiffs recovery may be reduced by proof of facts "tending but failing to prove the truth" of the libel's charge.' Crane v. New York World Telegram Corp., 308 N.Y. 470, 126 N.E.2d 753, 757, 52 A.L.R.2d 1169 [(1955)]."
271 Ala. at 490, 124 So.2d at 453.
Johnson Publishing is distinguishable from this case: Whereas Johnson Publishing involved punitive damages in a libel case, Slack asks this Court to remit the damages for mental anguish, which are considered compensatory damages.
 "Compensatory damages are designed to make the plaintiff whole by reimbursing him or her for the loss or harm suffered. Torsch v. McLeod, 665 So.2d 934, 940 (Ala. 1995). In contrast, punitive damages serve `"not to compensate the plaintiff but to punish the wrongdoer and to deter the wrongdoer and others from committing similar wrongs in the future."' Ex parte Weyerhaeuser [Co.], 702 So.2d [1227] at 1229 [(Ala. 1996)], quoting Green Oil Co. v. Hornsby, 539 So.2d 218, 222 (Ala. 1989)."
Ex parte Moebes, 709 So.2d 477, 478 (Ala. 1997). Whereas the partial truth of a matter asserted may mitigate the need to punish the wrongdoer or to deter similar wrongs as it relates to punitive damages, it does not mitigate the mental anguish suffered by the offending statement. Therefore, we decline to remit the mental-anguish damages award.
Because we presume that a jury's verdict is correct and that presumption is strengthened when the trial court denies a motion for a new trial, and because Stream provided sufficient evidence that he suffered mental anguish, we affirm the trial court's award of damages for mental anguish. See AlabamaPower Co. v. Murray, 751 So.2d 494 (Ala. 1999).
 C. Appropriateness of Punitive-Damages Award
Similarly, Slack argues that the record is devoid of any evidence of intentional, willful, or wanton conduct on his part upon which to base an award of punitive damages. However, in making this argument Slack fails to cite any controlling precedent or authority in support of his argument, thus failing to meet the requirements of Rule 28(a)(10), Ala. R.App. R. Regarding compliance with Rule 28, this Court recently stated: *Page 534 
 "We note that waiver of an argument for failure to comply with Rule 28(a)(10), Ala. R.App. P., has been limited to those cases where there is no argument presented in the brief and there are few, if any, citations to relevant legal authority, resulting in an argument consisting of undelineated general propositions. See Jimmy Day Plumbing Heating, Inc. v. Smith, 964 So.2d 1
(Ala. 2007)(appellant's argument was insufficient to invoke review of the allegedly excessive compensatory-damages award to plaintiff/appellee in a personal-injury action where the appellant's three-sentence argument cited only a single case in support of a general proposition of law and offered no discussion of the nature and extent of the plaintiffs injuries); Davis v. Sterne, Agee Leach, Inc., 965 So.2d 1076 (Ala. 2007) (appellant's lone citation to a general principle of law without specific relevance to her action against financial services company was insufficient to meet the requirements of Rule 28(a)(10) to cite relevant authority in support of arguments); Hall v. Hall, 903 So.2d 78 (Ala. 2004) (the appellant cited no authority for the proposition that the checking account should have been included as an asset of the estate and presented no argument and cited no authority to support his conclusion that the ore tenus rule did not require an affirmance on this issue); and Ex parte Gonzalez, 686 So.2d 204 (Ala. 1996) (petitioner did not show a clear legal right to having capital-murder indictment quashed on the ground that the district attorney testified as a witness in front of the grand jury when the petitioner cited only a federal district court case that was not binding authority and that was distinguishable)."
Ex parte Borden, [Ms. 1050042, August 17, 2007] ___ So.2d ___, ___ (Ala. 2007) (footnote omitted). Because Slack fails to meet the requirements of Rule 28(a)(10), we do not address the merits of Slack's argument regarding the punitive-damages award.
 IV. Conclusion
Because the trial court correctly determined that Slack is not entitled to State-agent immunity and because the jury's award of compensatory damages is not against the weight of the evidence and Slack has failed to meet the requirements of Rule 28(a)(10) regarding his argument that the punitive damages are excessive, we affirm the trial court's judgment.
AFFIRMED.
SEE, LYONS, WOODALL, and PARKER, JJ., concur.
[1] A referee is a scholar in a specified field who anonymously reviews a submitted article for a journal and provides feedback to the editor.
[2] According to Howell-Moroney, he had discussed the plagiarism situation with his brother, a theologian, and decided "to take the path of grace and mercy with Dr. Stream" by not reporting the findings of reviewer 1 to Slack, chairman of the Department of Government at UAB.
[3] UAB's Department of Government falls within the ambit of the School of Social and Behavioral Sciences.
[4] The allegations regarding Stream's use of a graduate student's work as his own in reviewing manuscripts when Stream was a referee for a journal editor appear to be false. Shilkrot stated that the manuscripts he summarized concerned health-care issues. According to Stream, he served as a referee for those manuscripts in 2001 when he was an assistant professor at the University of Idaho. Shilkrot was a new graduate assistant for Stream, and Stream was unaware of Shilkrot's writing and analytical abilities. Thus, according to Stream, he asked Shilkrot to summarize the manuscripts Stream had already reviewed for the journal in order to evaluate Shilkrot's writing and analytical abilities. In order not to insult Shilkrot's intellect, Stream told him that his summarizing the manuscripts would save Stream time.
[5] Subsequent to the actions made the subject of this case but before trial, Capilouto was appointed provost of UAB.
[6] Stream filed a second amended complaint adding claims alleging negligence and/or wantonness and the tort of outrage against Slack. However, it appears from the record that Stream failed to pursue these claims during the course of litigation.
[7] Although Slack testified that he did not have such a conversation with Mans, in view of the verdict, the jury apparently believed that the conversation indeed took place.